Present:  All the Justices

ADVANCED MARINE
ENTERPRISES, INC., ET AL.

v.  Record No. 971950    OPINION BY JUSTICE BARBARA MILANO KEENAN
                                       June 5, 1998
PRC INC.

                FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
                        Paul F. Sheridan, Judge

     In this appeal, we consider issues in a chancery proceeding

involving both equitable and legal claims arising from an

alleged business conspiracy and breach of an employment

agreement.

     PRC Inc. (PRC) is a Delaware corporation that, among other

things, provided marine engineering services under contract to

the United States Navy.  Included in those services was

"shipbuilding support" that PRC rendered to the Naval Sea

Systems Command (NAVSEA).  Advanced Marine Enterprises, Inc.

(AME), a Virginia corporation engaged in the business of marine

engineering, also provided services under contracts with the

Navy, including NAVSEA.

     PRC requires every new employee to sign a uniform

Employment Agreement as a condition of employment.  The

Employment Agreement obligates PRC employees to protect PRC's

proprietary information and to refrain from disclosing such

information to individuals outside the company.  The Employment

Agreement also contains a non-competition provision, which provides in relevant part:

> Employee agrees not to compete with PRC for a period of eight months following termination of employee's employment, by rendering competing services to or, with respect to such services, solicit any customer of PRC for whom Employee performed services while employed by PRC, within 50 miles of a PRC office.

At various times during 1995, due to the loss of certain marine engineering contracts, PRC informed some of its marine engineering employees that they should look for other employment. On December 13, 1995, PRC announced that the company would be sold to Litton Industries, Inc. (Litton).[1]

In November 1995, prior to the announcement of the sale, C. Michael Pirrera, a senior manager in PRC's marine engineering department, contacted AME and inquired whether AME would be interested in employing all seven managers from PRC's marine engineering department (PRC Managers). When AME expressed interest in hiring the PRC Managers, AME and the PRC Managers, led by Pirrera, formed a plan (the Plan) under which AME would attempt to hire every employee in the PRC marine engineering department.

---

[1]Due to a conflict of interest caused by the sale to Litton, PRC was later required to sell one of its primary marine engineering contracts, the 400D contract, to a buyer other than Litton. In April 1996, PRC entered into a contract with Tracor, Inc., the parent company of Vitro Corporation (Vitro), for the sale of the "400D unit," which covered the 400D contract and approximately 80 PRC employees.

Under the Plan, AME agreed to make secret job offers to all employees in PRC's marine engineering department. These employees would be required to resign on the same day, December 29, 1995, without notice to PRC, despite PRC's requirement that employees provide two weeks notice of their intent to leave PRC's employ. The Plan's objective was to transfer PRC's entire marine engineering department to AME, including the PRC Managers, the other employees, all customer relationships, and all existing contracts. As one PRC Manager stated, the idea was "to put together an entity that the [PRC] customer can't live without."

AME knew about the terms of PRC's Employment Agreement before implementing the Plan. AME was aware that it faced a potential lawsuit by PRC to enforce the Employment Agreement, and that PRC could assert other causes of action against AME, such as tortious interference with contract. After projecting the nature and amount of damages that might result from a lawsuit by PRC, AME decided that the benefits of the Plan outweighed the potential consequences of a lawsuit.

To implement the Plan, some of the PRC Managers developed a "matrix" describing how the PRC Managers would obtain the business of PRC's marine engineering department. This "matrix" included detailed confidential and proprietary information about PRC's workload, the value of certain work, and the amount of

government funding available for each job in PRC's marine engineering department.  The "matrix" also evaluated each of PRC's jobs regarding the ease with which the job could be "pulled" from PRC or "diverted" to AME.

Based on employee information supplied by the PRC Managers, AME prepared "offer" letters to each of the PRC Managers and other marine engineering employees and authorized Pirrera to negotiate salaries with each employee.  The "offer" letters included a provision in which AME agreed to indemnify and hold harmless each PRC employee against any claim, demand, damage, or injury asserted by PRC in connection with the employee's employment by AME.

The PRC Managers devised a schedule for distributing the "offer" letters to the PRC employees based on the PRC Managers' concern that some employees might "blab" to PRC after receiving their AME "offer" letter.  Under this schedule, the PRC Managers planned to give job offers to those PRC employees who might "blab" only after offers were given to the employees who were unlikely to "blab."

The PRC Managers distributed the "offer" letters in mid-December 1995.  The PRC Managers delivered each letter personally, encouraged each employee to accept AME's offer, and emphasized the need to keep PRC from gaining knowledge of the

4

Plan prior to December 29, 1995, the date of the scheduled mass resignation.

On December 20, 1995, Pirrera learned that rumors of the Plan might "leak out" to PRC. In response, Pirrera sent an "e-mail" message to the other PRC Managers on December 21, 1995, which stated:

> Subject: Execute
> Gentlemen:
>
> Based on yesterday's events we need to do the following:
>
> > With the exception of the highest risk team members (i.e., people we are absolutely sure will blab), talk to the rest of the team today.
> >
> > Determine task backlogs immediately.
> >
> > Back up computer files immediately.
> >
> > Transfer files to client sites immediately.
>
> Remember gentlemen, we got to this point as a team and we will see this through as a team. Let's roll!
>
> Mike

On December 29, 1995, the whole group of 26 managers and employees from PRC's marine engineering department submitted letters resigning their employment with PRC, effective immediately. Before leaving PRC and without PRC's knowledge or consent, many of the PRC Managers and other PRC employees copied their client files and sent the files to client sites so that the files would be available once the employees began working at

AME. Many of the PRC Managers and employees also made "back up" copies of PRC computer documents and files, which they removed from PRC without PRC's knowledge. Some PRC Managers and employees also removed, without PRC's consent, various documents pertaining to ongoing projects and work in progress at PRC. In many cases, there were no similar documents left at PRC. All of the above-described information constituted confidential and proprietary information of PRC.

In January 1996, PRC filed a bill of complaint against AME, two AME executives, the former PRC Managers, and the other former PRC marine engineering employees.[2] Among other things, the bill of complaint contained a request for a temporary restraining order to prevent the defendants from using or disseminating PRC's confidential and proprietary information and from soliciting or performing services for their former PRC customers. The chancellor entered the temporary restraining order on January 2, 1996, but later modified its terms to exclude AME's business with governmental entities.

As amended, the bill of complaint also asserted both legal and equitable claims for relief. The five Counts relevant to this appeal are: 1) breach of fiduciary duty (Count I); 2) intentional interference with contractual relations (Count II);

_____

[2]In April 1996, AME signed a letter of intent with Nichols Research Corporation (Nichols) to sell AME to Nichols.

3) intentional interference with prospective business and contractual relations (Count III); 4) specific performance and breach of the Employment Agreement (Count IV); and 5) violation of Code § 18.2-499 (Count VII).

The matter was tried before a chancellor, who heard testimony from two expert witnesses and 41 other witnesses. PRC presented the testimony of Mark Bleiweis, a certified public accountant, who is an expert in the area of damage calculation in contract disputes. Bleiweis estimated that, of the several types of economic damage suffered by PRC in the loss of its marine engineering unit to AME, the largest amount of damages resulted from lost goodwill. Bleiweis defined goodwill as the excess of the sales price of a business over the fair market value of the business' identifiable assets.

To estimate the lost goodwill associated with the departure of the PRC Managers and employees, Bleiweis examined two sales of comparable businesses, PRC's sale of its 400D unit to Vitro and the sale of AME to Nichols. Bleiweis subtracted the value of each "comparable company's" assets from its sales price to determine the goodwill associated with each comparable sale. With respect to the Vitro sale, he then adjusted this figure to reflect the value to Vitro associated with the funded 400D contract. To account for the larger number of employees involved in both comparable sales, Bleiweis apportioned the

7

estimated goodwill figure for each of the two comparable businesses among the total number of employees involved in each transaction.

This calculation yielded a ratio or percentage that Bleiweis applied to calculate the goodwill lost by AME's acquisition of the 26 PRC employees.  Using the Vitro sale, Bleiweis estimated that PRC sustained $925,123 in goodwill damages from the loss of its marine engineering unit to AME.  Using the sale of AME to Nichols, Bleiweis estimated that PRC's lost goodwill damages were $841,965.

Bleiweis also testified that PRC will suffer a loss of profits as a result of the departure of the PRC Managers and employees.  Bleiweis estimated that the present value of the expected lost profits was $265,655, based on the revenues that the former employees' labor would have generated for PRC.  However, he testified that these damages were included in his estimate of lost goodwill.

AME, the AME executives, and the PRC Managers and employees (collectively, "AME") offered the testimony of Edward H. Ripper, a certified public accountant, as an expert in government contract accounting claims and valuation.  Ripper testified that Bleiweis' conclusions were "substantially overstated," "highly speculative," and contained many "calculation[] errors."  Ripper provided several adjustments to Bleiweis' figures and concluded

8

that PRC suffered zero damages from lost goodwill when Bleiweis' method was properly applied to the Vitro sale figures. Ripper also testified that the Vitro and Nichols sales were not true "comparable" sales.

On June 19, 1996, the chancellor found in favor of PRC on all counts at issue in this appeal, stating, "I think the method by which the [PRC Managers] elected to do this was covert, surreptitious, violated civil duties, [and] was absolutely wrong." During post-trial hearings, the chancellor stated that "[t]he total impact of this thing was outrageous. This was a group wrong, and they were intending to disadvantage their employer while sitting there silent setting up their own employer for the benefit of themselves and the benefit of AME."

Ruling from the bench, the chancellor awarded $1,245,062 in compensatory damages on each of Counts I, II, III, and VII. Although this amount was awarded on each of these four Counts, the chancellor did not aggregate these amounts but entered a single compensatory damage award of $1,245,062. Under Code § 18.2-500, the chancellor then trebled the $1,245,062 compensatory damage award entered on Count VII. Thus, the total amount of non-punitive damages awarded was $3,735,186.

The chancellor awarded punitive damages in the amount of $1,000,000 against AME, noting that he might be required to reduce that amount to $350,000 under Code § 8.01-38.1. He also

9

awarded varying amounts of punitive damages against certain PRC Managers and employees.

The chancellor took under advisement AME's argument that the award of treble damages under Code § 18.2-500 was subject to the punitive damages ceiling fixed by Code § 8.01-38.1. He also awarded PRC attorney's fees and costs, but deferred computation of those amounts to a later hearing.

On Count IV, based on breach of the non-competition clause of the Employment Agreement, the chancellor enjoined certain PRC Managers and employees for seven and one-half months from performing services for and soliciting work from those NAVSEA jobs for which each manager or employee provided services while employed by PRC. The chancellor stayed the injunction pending resolution of this appeal, and ruled that if the damages he awarded are approved on appeal, the injunction will be dissolved.[3]

After a hearing on several post-trial motions, the chancellor entered the final decree on June 18, 1997, about one year after the trial. He essentially incorporated the terms of his bench ruling, but reduced the punitive damage award against AME to $350,000 to comply with the terms of Code § 8.01-38.1. He awarded PRC $475,000 in attorney's fees under Count VII (Code

_____

[3]AME does not assign error to the conditional nature of the chancellor's injunction.

10

§§ 18.2-499 and -500). He also awarded PRC $113,365.56 in costs under Count VII. The costs awarded included $47,922.73 for PRC's expert witness fees, $27,826.31 for transcripts, and expenses for other costs such as meals, legal research, parking, cab fare, law clerk "temporaries," overnight delivery services, messenger services, telephone calls, and photocopying charges. The chancellor also ruled that PRC was entitled to receive prejudgment interest on the entire award from June 19, 1996, the date of his bench ruling.

On appeal, AME argues that the chancellor erred in (1) ruling that AME violated Code § 18.2-499, (2) enforcing the non-competition covenant of the Employment Agreement, (3) his calculation of PRC's lost goodwill and profits and his determination that PRC met its burden of proving damages, (4) awarding punitive and treble damages, (5) awarding PRC costs, and (6) awarding PRC prejudgment interest.

## I. VIOLATION OF CODE § 18.2-499

AME asserts that the chancellor erred in finding AME conspired to injure PRC in its business in violation of Code § 18.2-499. AME contends that to establish a violation of the statute, PRC was required to prove that AME acted with the purpose of injuring PRC. AME argues that since the chancellor failed to apply this evidentiary standard, his finding that AME violated the statute constitutes reversible error. AME also

11

asserts that there was no evidence AME acted with the purpose of injuring PRC. We disagree with AME's arguments.

In Commercial Business Systems, Inc. v. BellSouth Services, Inc., 249 Va. 39, 453 S.E.2d 261 (1995), we addressed the question whether a violation of Code § 18.2-499 requires proof of actual malice. There, the plaintiff alleged that the defendant's employee, in violation of Code § 18.2-499, conspired to destroy the plaintiff's reasonable business expectancy for a contract renewal with the defendant corporation by awarding a contract to the plaintiff's competitor in exchange for commercial bribes. The trial court granted the defendant's motion for summary judgment on the ground that the plaintiff failed to prove actual malice, which required the plaintiff to establish that the conspirator's primary and overriding purpose was to injure the plaintiff's trade or business. Id. at 46-47, 453 S.E.2d at 266-67.

We reversed the trial court, holding that the plaintiff was not required to prove actual malice. We stated that Code §§ 18.2-499 and -500 do not require a plaintiff to prove that a conspirator's primary and overriding purpose is to injure another in his trade or business. Id. at 47, 453 S.E.2d at 267. Rather, we explained that these statutes merely require proof of legal malice, that is, proof that the defendant acted

12

intentionally, purposefully, and without lawful justification. Id.

PRC's evidence was plainly sufficient to meet this standard of proof. The individuals in the business conspiracy participated in a scheme to take the entire marine engineering department from PRC and relocate the department at AME. As stated above, AME and the PRC Managers and employees planned and implemented this scheme in secrecy while the PRC Managers and employees were still employed by PRC. The PRC Managers and employees planned and executed a mass resignation without notice to PRC. They took from PRC original client documents and copies of documents containing confidential and proprietary information without PRC's permission or knowledge. Thus, we conclude that the evidence supports the chancellor's finding that AME conspired to injure PRC in its business in violation of Code §§ 18.2-499 and -500.

II. NON-COMPETITION CLAUSE OF EMPLOYMENT AGREEMENT

AME asserts that the non-competition clause in the Employment Agreement was unenforceable because it was unreasonably broad, unduly harsh, and oppressive. We disagree.

To determine whether a non-competition agreement may be enforced, a chancellor must consider the following criteria:

(1) Is the restraint, from the standpoint of the employer, reasonable in the sense that it is no greater than necessary to protect the

13

employer in some legitimate business interest?

(2) From the standpoint of the employee, is the restraint reasonable in the sense that it is not unduly harsh and oppressive in curtailing his legitimate efforts to earn a livelihood?

(3) Is the restraint reasonable from the standpoint of a sound public policy?

New River Media Group, Inc. v. Knighton, 245 Va. 367, 369, 429 S.E.2d 25, 26 (1993)(quoting Roanoke Eng. Sales v. Rosenbaum, 223 Va. 548, 552, 290 S.E.2d 882, 884 (1982)); accord Blue Ridge Anesthesia & Critical Care, Inc. v. Gidick, 239 Va. 369, 371-72, 389 S.E.2d 467, 468-69 (1990).

In New River Media, we enforced a non-competition agreement in which a radio disc jockey contracted not to engage in a competing business within 60 air miles of his employer's radio station for 12 months after leaving his employment. 245 Va. at 369-70, 429 S.E.2d at 26-27. In Roanoke Engineering Sales, we enforced an agreement that prohibited a corporate officer from competing with his employer for three years in any similar business located in Virginia or North Carolina that covered the same sales territory served by the employer. 223 Va. at 553, 290 S.E.2d at 885.

When compared with these agreements, the non-competition provision before us is not unduly harsh and oppressive in curtailing the legitimate efforts of former PRC employees to earn a livelihood. The restraints imposed also are reasonable

14

from the standpoint of a sound public policy.  The non-competition provision does not contain a blanket prohibition against working for a competitor.  Instead, the covenant merely prohibits an employee for eight months from "rendering competing services to or, with respect to such services, solicit[ing] any customer of PRC for whom Employee performed services while employed by PRC, within 50 miles of a PRC office."

The agreement's geographic limitation is not rendered too burdensome because PRC has approximately 300 offices worldwide.  In the context of the brief time period involved and the narrow definition of prohibited services, the geographic restriction does not pose an unreasonable restraint on departing employees.  Likewise, the restriction on solicitation of PRC customers is reasonable because the restriction is limited to the same eight-month period and was interpreted by the chancellor as applying only to certain specialized engineering areas of NAVSEA and individuals serviced by each employee while employed by PRC.  Thus, the record supports the chancellor's conclusion that the non-competition provision is valid and enforceable.

We also find no merit in AME's contention that the eight-month period provided in the non-competition clause has expired and may not be enforced.  On January 2, 1996, the chancellor entered a temporary injunction enforcing the terms of the non-competition clause.  For "public policy" reasons relating to

15

nature of the work and the governmental status of actual and potential "customers," the chancellor lifted the injunction two weeks later with regard to AME's business with governmental entities. Thus, since the portion of the injunction involving governmental entities was in effect only for two weeks, the chancellor did not err in ruling that seven and one-half months out of the eight-month prohibition on competition still may be enforced with respect to such governmental entities. See Blue Ridge Anesthesia, 239 Va. at 374, 389 S.E.2d at 470; Paramount Termite Control Co. v. Rector, 238 Va. 171, 176-77, 380 S.E.2d 922, 926 (1989); Roanoke Eng. Sales, 223 Va. at 556, 290 S.E.2d at 886.

### III. "GOODWILL" DAMAGES AND SUFFICIENCY OF EVIDENCE OF DAMAGES

AME contends that the chancellor erred in accepting PRC's evidence of damages, including its evidence of lost goodwill and profits. AME argues that PRC's evidence was based on flawed methodology and speculative calculations. Specifically, AME asserts that the chancellor failed to consider that PRC's marine engineering department made a profit of only $45,108 in 1995, and that the price for the sale of PRC to Litton did not change after the departure of the PRC Managers and employees. We disagree with AME's arguments.

16

As trier of fact, the chancellor evaluated the testimony and the credibility of the witnesses.  See RF&P Corp. v. Little, 247 Va. 309, 321, 440 S.E.2d 908, 916 (1994); Richardson v. Richardson, 242 Va. 242, 246, 409 S.E.2d 148, 151 (1991).  We will not set aside his findings on appeal unless they are plainly wrong or without evidentiary support.  Willis v. Magette, 254 Va. 198, 201, 491 S.E.2d 735, 736 (1997); RF&P Corp., 247 Va. at 321, 440 S.E.2d at 916.

After hearing detailed testimony from Bleiweis, PRC's expert, and Ripper, AME's expert, the chancellor accepted Bleiweis' methodology and evidence of damages.  We cannot say, as a matter of law, that the chancellor's determination was plainly wrong.

In determining PRC's damages for lost goodwill, the chancellor accepted Bleiweis' variation of the market value approach, a frequently-used method for computing goodwill damages that is based on the difference between the price a business would sell for and the value of its non-goodwill assets.  See Russell v. Russell, 11 Va. App. 411, 416, 399 S.E.2d 166, 169 (1990).  Because there was no sale associated with the transfer of the PRC Managers and employees to AME, Bleiweis utilized a variation of this approach by determining the value of goodwill associated with comparable sales and adjusting this figure to approximate PRC's lost goodwill caused

by the departure of the PRC Managers and employees. Ripper never criticized Bleiweis' use of the market value approach, but only stated that Bleiweis made certain errors in applying this method.

The chancellor found that the closest comparable sale for purposes of measuring lost goodwill was PRC's sale of the 400D unit to Vitro. The evidence showed that the purchase agreement between Vitro and PRC identified the goodwill associated with that sale by providing that Vitro would pay PRC $4,424,091 more than the value of the tangible assets involved. Using Bleiweis' methodology, the chancellor decreased this amount to reflect the value that Vitro would receive from the funded 400D contract and then adjusted the resulting figure to reflect the smaller number of employees involved in the departure of the PRC Managers and employees.

The chancellor concluded that the comparable sale of AME to Nichols corroborated Bleiweis' damage estimate for lost goodwill based on the Vitro comparable sale. Since there was no actual sale by PRC to AME, the chancellor rejected Ripper's opinion that the "best" transaction for measuring PRC's lost goodwill was the actual transfer of the PRC Managers and employees to AME.

Although Bleiweis estimated the amount of profit PRC lost by the departure of its marine engineering unit to AME, he

18

stated that these damages were included in his calculation of lost goodwill. Thus, in determining PRC's total damages, Bleiweis concluded that a separate damage figure for lost profits should not be added to the damage amount for lost goodwill. The chancellor agreed with Bleiweis on this issue and declined to award additional damages for lost profits, finding that lost profits damages were "subsumed" within the court's goodwill calculation.

The chancellor's conclusions reflected his acceptance of Bleiweis' methodology as the most appropriate and accurate measure of lost goodwill and profits. Thus, AME's complaint essentially is reduced to the fact that the chancellor accepted the testimony of PRC's expert witness, rather than the testimony offered by AME's expert. Since the chancellor's findings regarding PRC's lost profits and damages for lost goodwill are supported by credible evidence, we will not disturb those findings on appeal. See City of Manassas v. Board of Supervisors, 250 Va. 126, 137, 458 S.E.2d 568, 574 (1995); Jamerson v. Womack, 244 Va. 506, 510, 423 S.E.2d 180, 182 (1992); Russell, 11 Va. App. at 417, 399 S.E.2d at 169.

For the same reasons, we find no merit in AME's contention that the damage award was excessive as a matter of law. Although the record shows that the price for the sale of PRC to Litton did not change after the departure of the PRC Managers

19

and employees, Bleiweis emphasized that the departing group had goodwill value for purposes of maintaining the customer relationships necessary for contract retention. As stated above, the chancellor based the award of damages on his acceptance of Bleiweis' testimony, which constituted credible evidence in support of that award.

### IV. PUNITIVE AND TREBLE DAMAGES

AME argues that a chancellor in equity may not award punitive damages because any award of damages in equity is limited to compensating an injured party to make it "whole." AME contends that punitive damages are in the nature of a penalty and extend beyond mere compensation. AME also asserts that treble damages are punitive in nature and, thus, are likewise unavailable in a court of equity. We disagree with AME's arguments.

When a court of equity acquires jurisdiction of a cause for any purpose, the court may retain the entire cause to accomplish complete justice between the parties. Thus, the chancellor may hear legal claims and enforce legal rights by applying remedies available only at law. Waskey v. Lewis, 224 Va. 206, 213, 294 S.E.2d 879, 882 (1982). This rule applies "even to the extent of establishing legal rights and granting legal remedies which would otherwise be beyond the scope of [the chancellor's] authority." Erlich v. Hendrick Constr. Co., Inc., 217 Va. 108,

20

115, 225 S.E.2d 665, 670 (1976) (citing Johnston v. Bunn, 108 Va. 490, 493, 62 S.E. 341, 342 (1908)); see Iron City Sav. Bank v. Isaacsen, 158 Va. 609, 625, 164 S.E. 520, 525 (1932).

The rule is based on the principle that once a court of equity obtains jurisdiction in a case, the court has discretion to transfer the parties to a court of law for adjudication of their law claims or to conclude the litigation by giving complete relief in the chancery cause. Iron City, 158 Va. at 625, 164 S.E. at 525. The purpose of this rule is to prevent a "circuity of action and expense." See Smith v. Smith, 92 Va. 696, 698, 24 S.E. 280, 280 (1896). If a chancellor decides to retain jurisdiction over legal claims, the chancellor acts "as a substitute for the court of law." Id.; Iron City, 158 Va. at 637, 164 S.E. at 529.

PRC's bill of complaint sought both equitable and legal remedies. AME could have moved to transfer PRC's legal claims to the law side of the court under Code § 8.01-270, where it would have been entitled to a jury trial, but chose not to proceed in this manner. Thus, AME cannot now complain that the chancellor improperly awarded legal relief to PRC. See Brown v. May, 202 Va. 300, 309-10, 117 S.E.2d 101, 108 (1960). We also observe that the chancellor awarded compensatory, punitive, and treble damages under the various legal claims, not under any equitable claims. Therefore, we conclude that the chancellor

21

acted within his discretion in awarding legal relief on the law claims before him.

We disagree with AME that our decision in <u>Colonna Dry Dock Co. v. Colonna</u>, 108 Va. 230, 61 S.E. 770 (1908), requires a different conclusion. There, in an appeal from a decree denying specific performance of a contract, we addressed the issue whether the chancellor properly ruled that the forfeiture of a deposit would constitute a penalty and, therefore, could not be enforced in equity. <u>Id</u>. at 240, 61 S.E. at 774. Thus, unlike the present case, <u>Colonna</u> did not involve legal claims, but only a request for equitable relief. Since the chancellor here restricted his award of damages that are available solely at law to the law claims before him, <u>Colonna</u> is inapposite.

We also disagree with AME's contention that the chancellor erred in awarding treble damages. Code § 18.2-500(a) provides in relevant part:

> Any person who shall be injured in his reputation, trade, business or profession by reason of a violation of § 18.2-499, may sue therefor and recover three-fold the damages by him sustained, and the costs of suit, including a reasonable fee to plaintiff's counsel; and without limiting the generality of the term, "damages" shall include loss of profits.

This subsection explicitly allows an award of treble damages on proof of the cause of action provided under Code § 18.2-499. Nevertheless, AME asserts that treble damages may not be awarded in equity because Code § 18.2-500(b), which sets

22

forth the equitable relief available for business conspiracy claims brought under the statute, does not specifically state that treble damages may be awarded in a chancery case. Code § 18.2-500(b) provides in relevant part:

> Whenever a person shall duly file a bill in chancery in the circuit court of any county or city against any person alleging violations of the provisions of § 18.2-499 and praying that such party defendant be restrained and enjoined from continuing the acts complained of, such court shall have jurisdiction to hear and determine the issues involved, to issue injunctions pendente lite and permanent injunctions and to decree damages and costs of suit, including reasonable counsel fees to complainants' and defendants' counsel.

We conclude that this provision does not preclude an award of treble damages in a law claim heard in chancery. Instead of limiting the relief available in chancery, this subsection grants a complainant the additional right to seek and obtain injunctive relief, as well as "damages and costs of suit." The term "damages" in subsection (b) refers to the "three-fold" recovery of damages described in subsection (a).

Notably, much of the language from subsection (a) is not repeated in subsection (b). For example, subsection (b) does not expressly refer to a "person who shall be injured in his reputation, trade, business or profession by reason of a violation of § 18.2-499," yet this requirement is clearly a predicate for recovery under the statute in equity, as well as in law. Lost profits also are not mentioned in subsection (b),

23

but this subsection necessarily contemplates the right to seek recovery of lost profits in equity as compensatory damages. Thus, on consideration of the language of the entire statute, we conclude that a chancery court is permitted to award treble damages on a law claim under the provisions of Code § 18.2-500.

We also find no merit in AME's contention that our decision in Porter v. Wilson, 244 Va. 366, 421 S.E.2d 440 (1992), dictates a different result. Porter involved a trespass action in which a plaintiff contended, among other things, that the trial court erred in refusing to award him treble damages under Code § 55-334 for the unauthorized removal of timber from his property. Id. at 367, 421 S.E.2d at 441. Observing that treble damages are in the nature of a penalty and are not favored, we held that since the timber was removed by one acting under a bona fide claim of right, the trial court did not abuse its discretion in refusing to award treble damages. Id. at 371-72, 421 S.E.2d at 443. Thus, contrary to AME's assertion, Porter did not involve the issue whether treble damages may be awarded in a chancery case.

AME next contends that the chancellor's award of both punitive and treble damages was duplicative. Although AME concedes that the chancellor awarded punitive and treble damages under separate counts of the bill of complaint, AME argues that the conduct underlying the claims is the same and, therefore,

that the chancellor erred in awarding both types of damages.  We disagree with AME's argument.

The awards of punitive and treble damages were based on separate claims involving different legal duties and injuries. The chancellor awarded punitive damages under Counts I, II, and III, for breach of fiduciary duty, intentional interference with contractual relations, and intentional interference with prospective business and contractual relations.  The award of treble damages was limited to the business conspiracy claim of Count VII.

To prevail in its business conspiracy claim, PRC was required to prove that the defendants combined, associated, agreed, or acted in concert together for the purpose of willfully and maliciously injuring PRC in its business "by any means whatever."  Code § 18.2-499.  In contrast, the claims asserted in Counts I through III do not require such proof and relate solely to the employment relationship between PRC and the PRC Managers and employees.  Thus, the chancellor did not err in awarding PRC both punitive and treble damages.

We also find no merit in AME's contention that an award of treble damages is subject to the ceiling on punitive damages set forth in Code § 8.01-38.1.  When the words of a statute are unambiguous, we accord the statutory language its plain meaning. Haislip v. Southern Heritage Ins. Co., 254 Va. 265, 268, 492

25

S.E.2d 135, 137 (1997); Archambault v. Roller, 254 Va. 210, 213, 491 S.E.2d 729, 731 (1997).

Under the plain language of Code § 8.01-38.1, the limitation of $350,000 applies only to an award of "punitive" damages.  If the General Assembly had intended for an award of treble damages to be subject to this limitation, it would have included an express reference to such damages in the statutory language.  See Jones v. Jones, 249 Va. 565, 570, 457 S.E.2d 365, 368 (1995); Allstate Ins. Co. v. Eaton, 248 Va. 426, 430, 448 S.E.2d 652, 655 (1994).  In the absence of such a reference, we will not construe the plain statutory language in a manner that amounts to holding that the legislature meant other than what it actually stated.  See Davis v. Tazewell Place Assocs., 254 Va. 257, 260-61, 492 S.E.2d 162, 164 (1997); Haislip, 254 Va. at 268, 492 S.E.2d at 137; Jones, 249 Va. at 570, 457 S.E.2d at 368.

## V. COSTS

AME challenges the chancellor's award of several items of "costs."  AME asserts that in the absence of an explicit statutory provision, expert witness fees cannot be shifted to the losing party.  AME also contends that the chancellor abused his discretion in including numerous charges, such as fees for legal research and temporary employees, as costs in this case.

In response, PRC contends that under the provisions of Code § 18.2-500, PRC was entitled to all reasonable litigation expenses as the prevailing party at trial. We disagree with PRC.

The taxing of costs in litigation was unknown at common law and is purely a creature of statute. Ryan v. Davis, 201 Va. 79, 85, 109 S.E.2d 409, 414 (1959). Code § 18.2-500 provides that "costs of suit, including a reasonable fee to plaintiff's counsel" may be recovered on proof of a violation of Code § 18.2-499. Thus, with the exception of reasonable attorney's fees, Code § 18.2-500 makes no provision for an award of costs other than those ordinarily awarded under the general statutes of Title 14.1 of the Code addressing the taxing of costs. See Code §§ 14.1-177 through -201.

Since trial courts are vested with discretion under the relevant provisions of Title 14.1 to determine what costs should be taxed against a losing party, we examine the costs challenged by AME to determine whether the chancellor abused his discretion. AME takes exception to the chancellor's award of expert witness fees, and expenses for express mail service, messengers, meals, law clerk "temporaries," computer-based legal research, "library research," photocopies, parking, taxicabs, telephone calls, and transcripts. We conclude that the chancellor abused his discretion in awarding PRC recovery for

27

the above-challenged expenses.  Generally, unless otherwise specified by statute, a trial court's discretion to award costs under Code § 18.2-500, or under the relevant provisions of Code §§ 14.1-177 through -201, is limited only to those costs essential for prosecution of the suit, such as filing fees or charges for service of process.

Finally, we disagree with PRC's assertion that, in Ryan v. Davis, we "did not question" the trial court's award of costs for expert witness fees in a condemnation case.  Since the State Highway Commissioner did not assign cross-error to the award of such "costs," the issue was not before us in that case.

## VI. PREJUDGMENT INTEREST

AME asserts that the chancellor erred in awarding interest from June 19, 1996, the date of the bench ruling, because some of the damages still were unliquidated.  PRC responds that the chancellor did not err in awarding interest from that date, because the chancellor did not reduce the original amount of the award, with the exception of his reduction of the $1,000,000 punitive damage award to comply with Code § 8.01-38.1.

Generally, prejudgment interest is not allowed on unliquidated damages in dispute between the parties.  Skretvedt v. Kouri, 248 Va. 26, 36, 445 S.E.2d 481, 487 (1994); Beale v. King, 204 Va. 443, 447, 132 S.E.2d 476, 479 (1963).  However, the issue whether interest should be awarded, and from what date

28

any interest should run, is a matter submitted to the sound discretion of the trial court. Code § 8.01-382; Skretvedt, 248 Va. at 36, 445 S.E.2d at 487-88; Marks v. Sanzo, 231 Va. 350, 356, 345 S.E.2d 263, 267 (1986).

When the chancellor ruled on June 19, 1996, that PRC was entitled to $1,245,062 in compensatory damages, several matters remained to be resolved. First, the chancellor ruled that the parties would argue at a later date the issue whether treble damages awarded under Code § 18.2-500 were subject to the statutory "cap" of Code § 8.01-38.1. Second, although the chancellor awarded $1,000,000 in punitive damages against AME, he announced that he would determine at a later date whether this amount should be reduced under the provisions of Code § 8.01-38.1. Third, in his bench ruling, the chancellor did not determine the amount of attorney's fees or costs to be awarded PRC. Thus, as of the date of the bench ruling, the amount of AME's liability remained unliquidated as to all amounts except the original compensatory damage award of $1,245,062.

The chancellor did not resolve these outstanding issues affecting the amount of AME's liability until June 18, 1997, the date of entry of the final decree. AME did not cause the delay in the chancellor's entry of the decree. Rather, the chancellor candidly acknowledged that he was the cause of the one-year delay. Thus, we conclude that the chancellor abused his

discretion in awarding prejudgment interest on all amounts in excess of $1,245,062.

For these reasons, we will affirm the chancellor's decree, with the exception of the portion of costs and prejudgment interest specified in this opinion, and will remand the case for entry of a decree regarding costs and interest that is consistent with the principles set forth herein.[4]

Affirmed in part,
reversed in part,
and remanded.

_____

[4]Although AME argues that the chancellor erred in adopting the findings of fact as drafted by PRC, AME does not suggest that this constitutes ground for reversal of this appeal.  Thus, we do not address this argument on appeal.