126

## CIRCUIT COURT OF ARLINGTON COUNTY

James, Ltd.

v.

Saks Fifth Avenue, Inc.,
and Douglas Thompson

March 8, 2005

Case No. (Chancery) 03-802

BY JUDGE JOANNE F. ALPER

This case comes before the Court on James, Ltd.'s ("James") Bill of Complaint for injunctive and other relief against Saks Fifth Avenue, Inc. ("Saks") and Douglas Thompson. James seeks injunctive relief as well as compensatory and punitive damages, attorneys' fees, and costs against both respondents arising from Saks' employment of Thompson, a James employee. The Bill of Complaint contains six counts:[1] breach of fiduciary duty, intentional interference with contractual relations, intentional interference with business and contractual relations, specific performance and breach of the terms and conditions of James employee handbook (against Thompson only),

---

[1] Counts alleging violation of the Uniform Trade Secrets Act and violation of the Computer Crimes Act were dismissed by the Court upon respondents' motion to strike at the close of complainant's case.

violation of Va. Code § 18.2-499, and conversion. Both respondents denied all of complainant's claims and denied that James was entitled to any relief from this Court.

The parties presented evidence and arguments before the Court, sitting without a jury, on January 10 through 13 and January 25 and 26, 2005. At the conclusion of closing arguments, the Court requested that the parties submit proposed findings of fact and conclusions of law, and took the matter under advisement. After careful consideration of the evidence adduced by both parties, the arguments, the post-trial memoranda, and the law governing the issues herein, this letter opinion will set forth the Court's rulings on the issues joined.[2]

*Findings of Fact*

Complainant James is a unique, high-end men's clothing retailer, located in the Tysons Galleria Shopping Mall in McLean, Virginia (the "Mall"). The company was established in 1972 and sells very expensive clothes from elite European vendors and designers. The evidence at trial demonstrated that James has a long history of profitability, directing its sales and marketing efforts at a niche market of wealthy, demanding customers, both within and outside the Washington, D.C., metropolitan area. Since its inception in 1972, James has had stores in various locations throughout the D.C. area. When the Tysons Galleria opened in 1989, James was one of the first retail businesses to locate there.

James' marketing strategy has been to create a store image that represents the highest level of service available. James has created a very intimate and warm atmosphere in its store, and allows its salespeople to offer customers discounts, free alterations, gifts of free apparel and wine, travel, and other special services. There was extensive testimony and evidence at trial regarding the extraordinary services and "perks" that James provided for its customers: services that are virtually unheard-of in the retail business. That evidence was not disputed by the respondents and the Court will accept it as fact without setting those details forth in this opinion. Both Mr. Colen and respondent Thompson testified that James' management provides these

---

[2] Respondents filed a post-trial motion to strike regarding an exhibit attached to complainant's post-trial memorandum; the Court agrees with respondent's objections to that portion of the memorandum and the exhibit and has not considered either in reaching the decision in this case.

services through its sales staff in such a way that the customer believes that the concessions and special treatment are being provided by the salesperson individually, thereby cultivating a special, long-term personal relationship between the salesperson and his or her customers. Michael Colen, one of James' principals, testified that the store had successfully competed with Neiman Marcus, its close neighbor on the main floor of the Mall, for more than fourteen years, despite the fact that Neiman's carries many of the same high-end designer lines of clothing.

A significant part of James' business is the sale of custom-made suits. Both Richard Kessler, complainant's retail clothing expert, and Mr. Colen testified that James' "made to measure" ("MTM") business was very lucrative for the Tysons store. This merchandise was sold and paid for without the company having had to make any capital outlay to stock the merchandise in the store. Thompson testified that, once a customer was fitted for a "made to measure" suit, his size and preferences were recorded so that future purchases could be made by the customer or a family member without the customer having to come to the store. The evidence at trial demonstrated that approximately 40% of Thompson's business over the four years prior to his departure from James was "made to measure" and both James, and later Saks, considered him to be an expert in "MTM" clothing.

It is also noteworthy that many of James' employees, including Thompson, had been employed by James for more than fifteen years; Robert Sheldon testified that he had been with the company for twenty-four years. Complainant's evidence demonstrated that it takes many years for an employee to develop the requisite expertise to establish a substantial book of business and to be able to properly provide services to wealthy and demanding customers in James' unique establishment. To encourage its employees' long-term commitment to the company, James pays its sales associates a base salary and commissions, plus a full benefits package, including vacation, family health insurance, and disability insurance. Retail expert Kessler testified that this employee compensation and benefit package was rare in the retail industry.

The unrebutted evidence at trial established that Thompson had been the company's top salesman for a number of years and had the number one "book of business" in the store. In the three years before he left, Thompson's sales averaged nearly $1 million a year. The record demonstrates that Thompson's large and profitable book was composed of a number of customers developed over the course of his seventeen year employment history with James. Many were customers who were originally cultivated by Mr. Colen and were later directed to Thompson; moreover, Thompson was always given, or sometimes

took without asking, the first opportunity to go through customer books of employees who left James and to select the most lucrative accounts to add to his book of business. Thompson was often consulted by management in preparation for buying merchandise for upcoming seasons, with specific items being purchased by James for Thompson's customers.

Like all James' employees, Thompson was an "at will" employee. In 1998, James management distributed an employee handbook entitled "General Employee Guidelines, Policies, Practices, and Benefits" (the "Handbook") to all employees, including Thompson. The Handbook has a preface that states "THIS IS NOT A CONTRACT OF EMPLOYMENT." It contains, *inter alia*, sections addressing the protection of confidential information and another section containing a covenant not to compete for three years within a one mile radius. Thompson signed a document agreeing to the terms and conditions of the Handbook, including the covenant not to compete, on May 1, 1998.

As consideration for executing this document, Thompson was given a cash bonus and a clothing allowance, and continued his employment with James.[3]

The Memorandum on Confidentiality sets forth the items in which James claims a proprietary, confidential interest:

> customer names and lists, trade books, financial and pricing information, and all matters discussed at our meetings. This list is not exclusive. Assume that all private business information is included.

Compl. Exh. 4.

The Handbook also specifies that the employee's "Personal Trade Book," a compilation of customers' personal and pertinent information such as sizes, dates of purchase, and merchandise purchased was and would always remain the property of James. The evidence at trial established that books with Thompson's customers' information, including "made to measure" information, were maintained at the James store in loose leaf notebooks; in addition, information regarding these customers was maintained on the James' point-of-sale computer. When e-mail came into more general use, Thompson used it extensively to communicate with his customers, and maintained e-mail

---

[3] Ray Ybarme, another James' employee who was involved in the solicitations by Saks but ultimately remained with James, also executed a similar document in exchange for consideration.

addresses of his customers on the store laptop and on his personal computer, utilizing his personal America Online account. The evidence established that James had a business e-mail available at the store but it was extremely unreliable; hence salespeople regularly used their personal e-mail accounts to communicate with customers. Thompson also maintained some customer contact information in his personal Daytimer.

The Restrictive Covenant in the Handbook states:

> [b]y agreeing to work for JAMES, an employee agrees also that, upon leaving the employment of JAMES, for any reason, he or she will not own, operate, or be employed by a retail men's clothing store, or men's clothing sales department of a store, which is located within a one (1) mile radius of any JAMES store, for a period of three (3) years following termination of employment with JAMES.

*Id.*

James suffered through a difficult economic period from 2001 through 2003, as a result of the downturn of the high-tech business, the stock market slump, the attacks of September 11, and the popularity of "business casual" dress codes. In February 2003, James implemented a strategy of consolidation, closing its store in suburban Maryland's Montgomery Mall and moving its merchandise and two salespeople to the Tysons store. Mr. Colen testified that this strategy saved the James business.

Saks operates a national chain of "better women's specialty stores." The evidence at trial defined a better specialty store as one that sells primarily "soft goods," mainly apparel and accessories, and therefore different from a department store which also sells furniture and appliances. Additionally, a better specialty store generally has a more upscale, higher level of merchandise than a department store. Saks is considered a "better women's specialty store" because it sells primarily women's apparel, shoes, accessories, handbags, jewelry, cosmetics, furs, and bridal gowns. The evidence showed that most, but not all, Saks stores have a men's department, in which a significant amount of sales are made to women for their husbands.

The Saks store in the Mall has a men's department. Evidence showed that the Tysons store had annual gross sales of approximately $35 million in women's wear and approximately $5 million in men's wear. Donald Uselmann, Saks' Director of Stores for the southeastern part of the country, testified that, notwithstanding the strong demographics of the Tysons' area, the Saks/Tysons store did not meet the $50 million yearly sales goal of Saks

for a retail establishment of 120,000 square feet and that, despite the efforts of the general manager and other personnel and a major renovation completed in 2001, the store was consistently $10 million under corporate expectations. He also testified that the store lagged significantly behind its principal competitor in the Mall, Neiman Marcus.

During the time period relevant to this case, Kathleen Werner, the general manager of Saks/Tysons, was under pressure to dramatically increase sales, especially in the men's department. New salespeople were hired, beginning in 2003, and new lines of clothing were added. During the summer of 2003, Mary Amos, director of human resources at Saks/Tysons was looking for a replacement for a departed salesperson in the men's department.

Ray Ybarme, one of the two James employees solicited by Saks/Tysons, who ultimately elected to remain with James, testified at trial that he was initially "shopped" by someone who worked for Saks in Chevy Chase, Maryland. That person called him the next day and advised that she worked for Saks and asked him to come for an interview. Ybarme testified that he interviewed at Saks/Chevy but was not interested in working at that store. Within one week of that interview, Ybarme received a call from Mary Amos, the director of human resources at Saks/Tysons. Since he was concerned about James' financial future, given the slowdown in business and the closing of the Montgomery Mall store, Ybarme decided to explore the possibility of employment with Saks/Tysons. Not long after Ybarme began the Saks' interview process, Thompson was also contacted and began interviewing and negotiating with Saks regarding employment. Although both men were being recruited by Saks at the same time, they were never interviewed together; however, both men knew they were being recruited together and the recruitments were proceeding along parallel tracks with the same offers, timetables, and assurances being given to both. Over the course of their recruitment, the evidence shows that Ybarme and Thompson discussed all the aspects of the proposed move with each other, including legal protection, the use of customer information, and the timing of their resignations. The testimony of Mr. Ybarme, which the Court finds to be credible, is very important in resolving the factual issues in this case. Ybarme testified that he understood, from his various interviews and meetings with Saks' representatives, that "what they wanted us to do was to bring over our customers. I mean, that was the idea." Tr. 387. He stated that he was concerned about this request and the provisions of the restrictive covenant, since he realized that the Saks/Tysons store was well within the covenant's one mile radius. He was worried about the "legal ramifications" and so

advised the Saks' representatives when he provided them a copy of the James Handbook, including the restrictive covenant.

The evidence at trial, especially the documentary record, supports the finding that Saks was recruiting these two salesmen not only for their "skill sets" but also for their significant books of business. Evidence demonstrates that the Saks/Tysons store had never had a million dollar book in the men's department and that Saks believed that Ybarme's "book" (second highest at James) was $850,000, with Thompson's sales significantly higher. In an e-mail dated July 15, 2003, Kathy Werner, general manager of Saks/Tysons, stated to Ms. Amos "we need these guys and their clients!!!!!!" Compl. Ex. 11, R0126.

On July 23, Ms. Werner wrote an e-mail to Thomas Ott of Saks, with copies to Mr. Uselmann, Ms. Amos, and others, regarding her interview of Thompson. She stated: "Tom: I met with Doug Thompson last night and he is TERRIFIC . . . we discussed his clienteling and he is DRIVEN by [s]ales and by his relationships with his clients. . . . we need to ensure that we stock . . . whatever *to keep his clientele. . . .* they need to have some lines in store to show *if we are to keep their client base.*" Compl. Ex. 11, R0132 (emphasis added).

Saks went to extraordinary lengths to hire Ybarme and Thompson; Uselmann testified that he personally "pitched" $100,000 plus compensation packages to the corporate compensation committee in order to put together a proposal that would provide the two salesmen with sufficient inducement to come to work for Saks/Tysons. He told Ms. Werner in a July 29, 2003, e-mail "you need to do whatever it takes to get these guys." Compl. Ex. 11, R0139. Cody Kondo, Saks' corporate General Merchandise Manager for menswear, wrote an e-mail to Ms. Werner and Mr. Uselmann strongly urging them to hire these salesmen, stating "We need to get these guys. Talk about a quantum leap in volume." Compl. Ex. 11, R0126.

The evidence also demonstrates that Saks' executives knew that these two "big book hires" were currently employed at James, a small high-end men's specialty store. They knew that each salesman wrote approximately $1 million per year in sales; that James had recently closed its Montgomery Mall store; and that, if their two top salesmen moved to Saks, James' lease was "soon up for renewal and they may simply choose to close." Compl. Ex. 11, R0127. The documentary evidence, most notably a series of e-mails among Saks' corporate executives and including Ms. Amos and Ms. Werner of the Tysons store, shows that Saks was aware of, and considered, sensitive information regarding James, including its business and the sales generated by Thompson and Ybarme, its potential vulnerability should it lose these two

"big books," its lines of merchandise, and the impact of hiring these salesmen in connection with specific desired vendors. Compl. Ex. 11.

Hiring Thompson and Ybarme also provided Saks/Tysons with the means to obtain a significant vendor, Canali. Mr. Uselmann's e-mail of July 18, 2003, urges another reason to hire these two men: "Canali clothing is sold at James. Canali has refused to sell to us in Tysons but agreed to do so immediately if we hire these two guys. Canali may also be willing to give us some side-pay." Compl. Ex. 11, R0127. Hiring Thompson and Ybarme, therefore, would provide Saks/Tysons the ability to sell a line of clothing that Uselmann referred to as one of the "ABC's" of men's merchandise in Saks stores.

Moreover, the evidence demonstrates that, throughout its negotiations with Ybarme and Thompson, Saks was aware that both men were subject to a Restrictive Covenant and Memorandum on Confidentiality.[4] Saks was clearly aware that its location, across the hall from James in the same mall, was within the one-mile radius of the Restrictive Covenant. Saks was provided, reviewed, and considered the James Handbook, which clearly states that it is confidential and proprietary and not to be disclosed to third parties. E-mail communications between Thompson and Ms. Amos clearly demonstrate that he freely disclosed confidential James' customer information on numerous occasions, occasionally using James' telephone to schedule meetings and share other information and, on one occasion, using James' in store computer to send Ms. Amos an e-mail at 12:24 a.m., complimenting her staff for the after-hours "tour" of the Saks/Tysons store that he had just completed. Compl. Ex. 6, R0144.

At trial, Mr. Ybarme testified that, on two separate occasions in August and September of 2003, he and Thompson generated hard copies of their customers' personal information that had been stored on James' in-store computers, doing this during store business hours but when the owners were not on site. He testified that Thompson knew how to access the customer information from the computer and that they both did so for the express purpose of demonstrating to Saks that they had a large number of customers to

---

[4] The Court notes that the Saks employee handbook was also in evidence and states that Saks considered as confidential any information "regarding the Company, its suppliers or perhaps even fellow Associates . . . [and that each employee was] . . . to in no way reveal or divulge any such information unless it is necessary for you to do so in the performance of your duties." Compl. Ex. 10, p. 39. This provision is comparable to the confidentiality requirement in the James Handbook.

bring with them. This testimony was corroborated by the print-outs of Ybarme's lists with Thompson's handwritten notes thereon (Compl. Exs. 60(a) and 61(a), (b), (c)) and by Thompson's testimony admitting that he generated hard copies of his customer information from James' computers during this time period. Tr. 1157-59.

Thompson testified that his reason for printing these documents was for the purpose of clearing out extra and unnecessary information from his "book." If this were so, he would only have had to delete the information from the computer files; it would be unnecessary to actually print out hard copies of the information he wanted to eliminate. On this issue, the Court credits as true Mr. Ybarme's testimony and the reasonable and logical inferences from that testimony to conclude that Thompson and Ybarme intended to show them to Saks for negotiating purposes and to use them to contact and solicit James' customers once they left employment. The Court finds that Thompson took confidential James customer information, including these lists and the information contained in Complainant's Exhibit 5, Thompson's customer books, with him when he moved to Saks. Not only did he remove this proprietary information, the evidence proves to the Court's satisfaction that he physically took most of the written records regarding these customers from James' premises, thereby making it even more difficult for James' owners and other salespeople to attempt to "save" those customers for James.

The Court has found as a matter of fact that Thompson intended to, and did take, confidential James customer information with him when he left James to join the employ of Saks.

The next factual issue is whether Saks knew he planned to do so. As stated above, the numerous e-mails exchanged by various Saks executives indicate that they wanted these two salesmen "and their clients." Ybarme testified that he presented a package containing his customer lists to Ms. Werner, general manager of Saks/Tysons. Although Mr. Ybarme stated that Ms. Werner told him she did not want to see the documents and pushed them back across the table to him, her acknowledgement of this exchange proves that she knew that Mr. Ybarme had taken James' customer information. This is the same type of information which Saks would consider proprietary and confidential under the terms of its employee handbook,[5] and which Saks and Ms. Werner knew, from the Handbook, that James considered confidential and proprietary. At this meeting, Ms. Werner did not tell Mr. Ybarme that he

---

[5] Ms. Werner testified that it would be inappropriate for a Saks employee to take confidential information, including customer lists, with him when he left the company.

should not take his customer list from James, nor that he could not use his employer's customer list to solicit business once he began to work for Saks; rather she just stated that she did not want to *see* it.

It is clear that Saks knew that Thompson and Ybarme planned to take the confidential customer lists from James and use them to solicit business for Saks and, knowingly and actively, encouraged and participated in this activity. In late September, just before he planned to resign from James, Thompson raised a concern, in an e-mail to Ms. Amos, that he might be liable to James for "Tortious Business Interference" which he understood to be a claim for "directly contacting my customers for the purpose of soliciting their business." Compl. Ex. 6, R0159. Thompson wanted to ensure that, if he was sued by James for this activity, Saks would "back" him and protect him from liability since "[o]bviously this is one medium to get my customers over to Saks." *Id.* Jerry Kirby, Saks' corporate counsel, who had previously opined as to the invalidity of the Restrictive Covenant, responded to Thompson's e-mail inquiry that Thompson could "contact his former clients, tell them he has moved, and *otherwise solicit their business.*" Compl. Ex. 13, R0311 (emphasis added).

Moreover, Thompson sent Ms. Amos copies of various e-mails sent to his James customers immediately upon his resignation, as well as copies of their responses. Compl. Ex. 12. Ms. Werner testified that, had she known that Thompson was soliciting business from James' customers, she would have instructed him to stop; however, Ms. Amos' undeniable knowledge of Thompson's activities via these e-mails is sufficient to attribute this knowledge and acquiescence to Saks. Saks could have put an immediate end to this activity by telling Thompson not to use his customer lists to solicit business; however, Saks remained silent, thereby establishing to this Court's satisfaction that Saks both encouraged and condoned Thompson's activities. In fact, this solicitation was successful, and Thompson testified that he was able to bring forty to fifty of his core customers to Saks from James.

The evidence at trial also supports the finding that Saks was aware of the Restrictive Covenant which Thompson and Ybarme had signed as a condition of their continued employment at James; the entire Handbook was given to Saks early in the negotiation process. Mr. Kirby, although not a Virginia lawyer, opined that he believed the Restrictive Covenant was not enforceable. Compl. Ex. 13, R0285, 0287. However, Thompson and Ybarme were both concerned about, and wanted, indemnity from Saks in the event of a suit by James regarding the Restrictive Covenant. Compl. Exs. 6 and 13. Thompson specifically required written documentation that Saks would indemnify him before he would commit to taking the job. Compl. Ex. 6. Saks provided letters

of indemnity to Thompson and Ybarme on September 9, 2003. Compl. Exs. 8 and 37.

The evidence in this case supports the finding that the Restrictive Covenant in this case was both necessary and appropriate. Mr. Colen testified that he recognized his employees' right to obtain better opportunities if they became available; therefore, he drafted a Covenant with a very small radius of exclusion which essentially covered only the shopping centers in which they operated. The geographic limitation of one mile, considering the size and breadth of the Washington, D.C., metropolitan retail market, was extraordinarily narrow. In essence, it denied Thompson only the right to obtain employment in a competing store within the Tysons Corner area, leaving open the fertile retail areas of Pentagon City in Arlington, Old Town Alexandria, Fair Oaks Mall, and the many new malls in the western part of Fairfax County, including the burgeoning Dulles region, not to mention all of Washington, D.C., and the high-income portions of Bethesda, Potomac, and Chevy Chase in Montgomery County, Maryland, including Saks' own store in Chevy Chase. Indeed, Mr. Uselmann of Saks noted in an e-mail that, if the Restrictive Covenant were determined to be valid, Saks could simply move Thompson to the Chevy Chase store. Comp. Ex. 13, R0303. Since the area of exclusion was so narrow, the three-year limitation was also clearly necessary and appropriate to protect James' interests in its immediate geographic location. As Mr. Colen testified, it took approximately three years for a salesperson to "capture" and develop a customer from a salesman who had left (Tr. 208); hence, the timeframe of the restriction had a reasonable and necessary basis. Both the geographic and time scope of the Restrictive Covenant placed only a minimal burden on the employee who had an extraordinarily broad range of employment options even while adhering to the terms of the Covenant. Clearly, the goal of the Restrictive Covenant was to protect James from the actions of Thompson, a seventeen-year employee, from moving to a competing store in the same mall.

The evidence demonstrates that James had reason to fear direct competition from Thompson in the same mall. Saks' own evidence indicated that the single most important factor in customer purchase choices was the customer's relationship with the store's salespeople. Compl. Ex. 33. Peter Krieg, Saks' retail expert, testified that James could not expect its long-term Montgomery Mall customers to drive across the river into Virginia to shop at the Tysons' store, yet Saks vigorously recruited Thompson and Ybarme, James' two top salesmen, for the express purpose of getting and keeping their clients whom they knew would likely continue to shop in the Tysons Galleria mall.

Following almost two months of exploration, negotiation, and cooperation, with copies of customer lists and confidential information and with job offers containing guaranteed salaries and indemnification in hand, Thompson and Ybarme planned a simultaneous resignation from James. On September 30, 2003, Thompson told Michael Colen, for whom he had worked for more than seventeen years, that he was resigning, giving Mr. Colen two weeks' notice but not coming back to James. Tr. 216. Although he was initially hesitant to reveal his new employer, he finally relented and told Mr. Colen that he would be moving to Saks Fifth Avenue in the same mall. Mr. Colen testified that he pleaded with Thompson to give him five minutes to discuss this "bombshell" and try to change his mind, but Thompson refused and left the store. Five minutes later Ybarme, who had been waiting in the parking lot, came in and likewise told Mr. Colen he was resigning to go to work for Saks. Unlike Thompson, Ybarme stayed to talk to Mr. Colen and ultimately decided to remain at James, after they matched the salary offer he had received from Saks.

On October 9, 2003, Thompson began employment with Saks Fifth Avenue at the Tysons Galleria mall. James filed this suit, seeking damages and injunctive relief, on December 11, 2003.

## Conclusions of Law

### 1. Enforceability of Restrictive Covenant

The first issue to be addressed by the Court is the validity and enforceability of the Restrictive Covenant. Respondents do not contest the geographic or temporal scope, one mile radius for three years, of the Restrictive Covenant as being overbroad;[6] rather they argue that it is not contractually binding on Thompson because the basic elements of contract formation were not present and because it was contained in the employee Handbook, the preface of which states in capital letters "THIS IS NOT A CONTRACT OF EMPLOYMENT." Compl. Ex. 4. For the reasons set forth below, the Court finds as a matter of law that the Covenant is reasonable, valid, binding, and enforceable.

---

[6] Although this issue was briefed by respondents in their Motion to Strike Complainant's evidence, there was no significant discussion of this issue in their closing memorandum.

Addressing briefly the question of whether the Restrictive Covenant is overbroad, the Court will examine settled Virginia case law which requires that the analysis must include a consideration as to whether the restraint was no greater than necessary to protect the legitimate business interest of the employer, whether it was unduly harsh and oppressive to the employee, limiting his opportunity to earn a living, and whether the restrictive covenant is consistent with sound public policy. *Advanced Marine Enterprises, Inc. v. PRC Inc.*, 256 Va. 106 (1998); *Rash v. Hilb, Rogal & Hamilton Co. of Richmond*, 251 Va. 281 (1996); *see also New River Media Group v. Knighton*, 245 Va. 367 (1993) (affirming that a non-competition clause establishing a twelve month, sixty air mile limit for a disc jockey at a radio station was neither unduly harsh nor oppressive).

The evidence in this case clearly demonstrates that the Restrictive Covenant was neither overbroad nor excessive. From the employer's standpoint, the evidence supports the conclusion that the one-mile, three-year restriction was no greater than was necessary to protect the legitimate business interest of James,[7] and from the employee's perspective, the restriction was not unduly harsh nor oppressive to Thompson and it certainly did not limit his opportunity to earn a living in the men's retail business in the Washington, D.C., metropolitan area.

The next question is whether the Restrictive Covenant was a binding contract. Like all James' employees, Thompson was an "at-will" employee whose tenure was not for a fixed term, but rather terminable by either party. *See Hechler Chevrolet, Inc. v. G.M.C.*, 230 Va. 396 (1985). When a company continues to employ at-will employees and provides them with access to valuable information after they sign non-competition agreements, courts have held that requisite and sufficient consideration for the promise not to compete has been given. *Paramount Termite Control Co. v. Rector*, 238 Va. 171 (1989).

The fact that Thompson was an at-will employee has no bearing on the enforceability of the terms and conditions in the Handbook, specifically the confidentiality provisions and Restrictive Covenant. The disclaimer in the

---

[7] Indeed, Saks' own retail expert, Mr. Krieg, attested to the importance of loyalty to a salesperson in determining a customer's choice and the importance of geography in this consideration; just as they would not expect many customers to "cross the river" from Maryland into Virginia, Saks also expected that Thompson's customers would easily find him *in the same mall*. It is this danger that the Restrictive Covenant sought to protect against.

preface of the Handbook only makes it clear that the provisions therein do not constitute a contract *of employment*; it does not indicate or support the argument that certain of its provisions, properly acknowledged and supported by consideration, were not contractually binding on the employees. The evidence proved that Thompson was given the Handbook, that he reviewed it and understood all its provisions, and on May 1, 1998, signed an acknowledgment agreeing to abide by all of its provisions "particularly the confidential information/trade secret and restrictive covenant terms. . . ." Compl. Ex. 4. The evidence further supports the conclusion that this agreement by Thompson was supported by consideration by James, including a cash bonus, clothing allowance, and continued employment.

Respondents further argue that there was no "meeting of the minds" regarding the intent to contract and no mutuality of obligation. Neither of these arguments is persuasive. Thompson clearly understood the obligations he undertook in signing the document on May 1, 1998, and, as shown by his negotiations with Saks for indemnification as a condition of his accepting employment, believed that he was bound to comply and could be liable for a violation. "[A] contract involves a bilateral exchange, a meeting of the minds, and an understanding of the obligations undertaken. . . ." *Jones v. Peacock*, 267 Va. 16, 20 (2004). The evidence proves that the Restrictive Covenant meets these requirements, an exchange of cash bonus, clothing allowance and continued employment for Thompson's signature and agreement, and clear understanding by both parties of the obligations undertaken.

The Court also finds that Saks clearly had knowledge of the terms and conditions of the Restrictive Covenant at the time it hired Thompson. Indeed, Saks essentially encouraged Thompson to violate his agreement with James by offering him full indemnification in the event of a suit or claim by his former employer, even though it could have taken advantage of his highly sought-after "skill set" by placing him in the Chevy Chase, Maryland, store, well outside the one-mile limit, rather than at Tysons.

Having found the Restrictive Covenant valid and enforceable, the next issue is the injunctive relief sought by the complainant. In closing argument, respondents noted that Thompson had been working at Saks for more than fifteen months, and therefore it would no longer serve any purpose to enforce the Restrictive Covenant by an injunction. This Court finds that the blatant violation of the Restrictive Covenant by Thompson, with full knowledge and encouragement of Saks, should not be excused or condoned merely by the passage of time. Moreover, respondents should not be "rewarded" for these breaches any more than they already have by virtue of the revenues Saks and Thompson have received for his sales at Tysons during the time since his

departure from James. As in the case of *Paramount Termite Control Co. v. Rector*, 238 Va. 171 (1989), this Court does not believe the passage of time has made this issue moot.

Count 4 also claims a violation of the memorandum on confidentiality contained in the Handbook. For the reasons stated above, the Court finds that the memorandum on confidentiality was a binding contract between Thompson and James and is enforceable by injunctive relief. Complainant also seeks damages relating to the conversion and use of confidential information in other Counts of the Bill of Complaint. Those claims will be addressed in the sections following.

Accordingly, the Court finds in favor of the complainant and against Thompson on Count 4 of the Bill of Complaint and will order that the respondent Thompson be immediately enjoined from working at Saks/Tysons for a period of three years beginning from one week after the date of this Letter Opinion.

## 2. Breach of Fiduciary Duty

As an employee, Thompson owed James a common law fiduciary duty of loyalty and fidelity. *See Williams v. Dominion Technology Partners, L.L.C.*, 265 Va. 280 (2003). An employee's fiduciary duty arises independent of employment contracts, including, but not limited to, covenants not to compete and confidentiality agreements. *Feddeman & Co. v. Langan Assoc.*, 260 Va. 35, 38 (2000). That duty included the obligation to maintain the confidentiality of James' business information and customer lists. In addition to his common law fiduciary duty, Thompson had a contractual obligation to keep James' Handbook, customer list, and other business information confidential, and not disclose such information to Saks. Using that information to the detriment of his employer and to the benefit of a competing store is the basis for a claim of breach of fiduciary duty.

Clearly, Thompson had the right to move freely from the employ of James to work for another retailer, subject to the terms of the Restrictive Covenant. But his right to move freely must be tempered by the principle that his fiduciary duty to his employer prohibits actions adverse to that employer's interests. The Virginia Supreme Court has held that, while an employee may, in some instances, have the right to make arrangements during his employment to compete with his employer after resigning, that right is not absolute, but rather "based on a policy of free competition, must be balanced with the importance of the integrity and fairness attached to the relationship between employer and employee . . . under certain circumstances, the exercise

of the right may constitute a breach of fiduciary duty." *Feddeman & Co.*, 260 Va. at 42. The Court stated that the misappropriation of trade secrets, misuse of confidential information, or solicitation of the employer's clients or other employees prior to resignation constituted a breach of the fiduciary duty owed to the employer. *Id.*; *see also Hilb, Rogal & Hamilton Co. v. DePew*, 247 Va. 240, 246 (1994) ("an employee's fiduciary duty to his employer prohibits the employee from acting in a manner adverse to his employer's interest").

Both Thompson and Ybarme owed James a fiduciary duty to exercise the utmost good faith and loyalty and not to act in a manner adverse to its interests. Both of them breached that duty when they provided Saks with confidential information, specifically the employee Handbook, and when they reproduced the customer lists from James' computer for the purpose of using the information contained therein in connection with their employment with Saks.

Moreover, Thompson owed James a fiduciary duty not to use James' proprietary business information to the benefit of his new employer and the detriment of James. Specifically, the Court has already found as a matter of fact that Thompson reproduced his customer lists from the James computer and took them with him to Saks; the Court has also found that he took his client books and the folder of information relating to James' made to measure customers, all of which was confidential and proprietary business information which belonged to James. In committing these acts, Thompson breached his fiduciary duty to James, and the use of this information resulted in a competitive advantage to Thompson and Saks, while causing damage to James.

The Court has also previously found that Saks, through its employees, was aware of, and actively supported, encouraged, aided, and abetted Thompson's actions in breaching his fiduciary duty. The purpose of Saks' actions in this matter was to divert James' customers to Saks to the detriment of James and the benefit of Saks. Therefore, Saks is liable to James as a co-conspirator in Thompson's breach of fiduciary duty.

Accordingly, on Count I of the Bill of Complaint, the Court will enter judgment against Thompson and Saks, jointly and severally. The determination of damages in connection with this claim will be discussed in Section 6 below.

### 3. Violation of Va. Code § 18.2-499

Count VII of the Bill of Complaint seeks recovery against Saks and Thompson for violation of Virginia Code § 18.2-499 *et seq.*, which prohibits

conspiracy to injure another's business and defines both a crime and a civil remedy for violation of the statute. Conspiracy is defined as the combination of two or more people acting in concert for the purpose of "willfully and maliciously injuring another in his reputation, trade, business, or profession by any means whatever." A party injured by violation of this statue is entitled to recover treble damages and attorney's fees.

In determining whether James has proven facts sufficient to warrant a recovery under this statute, the Court is guided by the seminal decision of *Advanced Marine Enterprises, Inc. v. PRC*, 256 Va. 106 (1998). Notably, on the issue of intent, the Supreme Court ruled that a plaintiff under that statute need not prove actual malice, nor must he prove that the conspirators' primary and overriding purpose was to injure another in his trade or business. *Id.* at 117. The Court ruled that the plaintiff must prove only that the conspirators acted intentionally, purposefully, and without lawful justification. *Id.*; *Commercial Business Systems, Inc. v. BellSouth Services, Inc.*, 249 Va. 39, 47 (1995) (citing *Worrie v. Boze*, 198 Va. 533, 543 (1956)).

The Court clarified and expanded this issue in *Feddeman*, 260 Va. 35, when it reversed the trial court and reinstated a jury's award of damages, ruling that respondents had intentionally, purposefully, and without legal justification, conspired to injure Feddeman's business where they knew that their actions would financially injure the plaintiff. The Court noted that the element of malice does not "require the plaintiff to prove that a conspirator was motivated by . . . a desire to injure the plaintiff." *Id.* at 44.

The Court has found facts in this case that are sufficient to meet the Supreme Court's standards. As stated above, Thompson and Ybarme and the representatives of Saks (Werner, Uselmann, Amos, and Kirby) intentionally, purposefully, and without legal justification conspired and combined with Thompson and Ybarme to induce a breach of the terms and conditions of James' Restrictive Covenant and Memorandum on Confidentiality by Thompson and Ybarme, so that the two men would become Saks employees and to bring their extensive "books of business" in the form of their customer lists to Saks' men's department. All of this was done while Thompson and Ybarme were still employed by James.

Thompson and Ybarme resigned from James on the same day, without notice, one right after the other; Saks was aware that this was the manner in which the resignations would occur. As was the case in *Feddeman*, these resignations represented fifty percent of James' historical sales. Although Ybarme ultimately withdrew from the conspiracy after tendering his resignation to Mr. Colen, Thompson continued to participate in the conspiracy with Saks. Upon leaving James, Thompson took with him original documents

and copies of confidential and proprietary information, including the customer lists, the "MTM" file with information about customers, his list of customer e-mail information, and the pages of his personal trade book.

The record is replete with evidence that both Thompson and Saks were aware of the damage that their conspiracy would likely cause to James. As stated previously, Saks' executives' e-mails are consistent in their stated desire to get the two James salesmen "and their clients." They were aware of the importance of loyalty to a salesperson as driving a customer's choice of stores in the retail industry. They were aware of the Restrictive Covenant governing the salesmen's employment. They were aware of James' Memorandum on Confidentiality. They were aware that the salesmen had taken their customer lists and other confidential information. They were aware that the two salesmen represented fifty percent of James' historical sales. And they were aware that the loss of these two salesmen and their clients to a store in the same Mall might cause James such financial distress that they might simply choose not to renew their lease and decide to go out of business. Accordingly, the Court finds that the conspirators acted intentionally, purposefully, and without lawful justification and that James suffered damage and injury as a result thereof.

Therefore, the Court finds that Saks and Thompson willfully and maliciously conspired to injure James' business in violation of Va. Code §§ 18.2-499 and 18.2-500 and will enter judgment against Saks and Thompson on Count VII of the Bill of Complaint with damages as set forth in Section 6 below.

### 4. Intentional Interference with Contractual Relations (Count II); Intentional Interference with Prospective Business and Contractual Relations (Count III)

Counts II and III of the Bill of Complaint allege the common law torts of intentional interference with contractual relations and intentional interference with prospective business and contractual relations. In Virginia, the elements of a cause of action for wrongful interference with prospective business relations or economic advantage are: "(1) the existence of a business relationship or expectancy, with a probability of future economic benefit to plaintiff; (2) respondent's knowledge of the relationship or expectancy; (3) a reasonable certainty that, absent respondent's intentional misconduct, plaintiff would have continued in the relationship or realized the expectancy; and (4) damage to plaintiff." *Commercial Business Sys., Inc. v. Halifax Corp.*, 253 Va. 292, 300 (1997) (quoting *Glass v. Glass*, 228 Va. 39, 51-52 (1984)).

Complainant relies on the findings in *Advanced Marine* and the alleged similarities between the facts in that case and the one at bar to support a finding in its favor on these two tort counts. However, unlike the present case, the plaintiff in *Advanced Marine* had specific, formal contracts and business arrangements with the federal government and other clients which were the subject of respondents' interference. The Supreme Court has held that a plaintiff must prove the existence of the business relationship or expectancy by an objective standard, rather than subjective expectations.

Although James has, as discussed above, presented substantial evidence of respondents' wrongful acts in this case, it has failed to offer sufficient proof of the first element of their claims for tortious interference; based on this failure, the Court will not address the other elements of these claims. Judgment will be entered for the respondents on Counts II and III.

### 5. Conversion of James' Property

Count VIII of the Bill of Complaint seeks damages for common law conversion of James' property, specifically including, but not limited to, the customer information, e-mail lists and "MTM" files that have previously been discussed in this Opinion. In its closing memorandum, Complainant concedes that "under circumstances as in this case, when the conversion was accomplished with malice, artifice, and device, damages for conversion may be subsumed in the other counts of the lawsuit." Compl. Mem. at 49.

The Court believes that the claims set out in the conversion count have been adequately and completely addressed in its rulings on the other claims in the Bill of Complaint, and that the damages to be awarded to complainant will fully and fairly compensate it for the wrongful actions of the respondents; accordingly, the Court will enter judgment for the respondents on Count VIII.

### 6. Damages

Having found in favor of James and against both respondents, the Court will now turn to the analysis of the evidence on damages. Respondents, in counsel's closing argument and in their post-trial memorandum, have made the primary argument that James has failed to carry its burden proof of damages and, therefore, the Court cannot rule in favor of complainant on any of its claims. As respondents correctly note in their memorandum "[I]n order to make out a cause of action, whether in tort or contract, a plaintiff must have appropriate proof of cognizable damages. *Locke v. Johns-Manville Corp.*, 221 Va. 951, 956 . . . [tort action]. . . ." Def. Mem. at 20. The Court agrees that

this is an accurate statement of the law; the Court disagrees with respondents' conclusion that James has failed to carry its burden.

The Court has found for James on two separate causes of action for which damages may be assessed: breach of fiduciary duty and violation of Va. Code § 18.2-499 *et seq.*[8] The damages analysis for both are identical, other than the trebling and attorneys' fees provisions for the statutory case, and the Court will address them as one.

James seeks damages for lost profits as a result of the wrongful actions of Saks and Thompson. The respondents argue that there has been no showing that their actions caused any loss or damage to James, since there was no evidence of specific customers lost and since James continued to show a profit even after Thompson's abrupt departure. Complainant's expert, Bruce Dubinsky, testified that James suffered damages of almost $1.5 million in lost profits and that those damages were directly attributable to the resignation of Thompson and loss of his long-standing, high-volume customer sales. Mr. Dubinsky testified that James had been profitable prior to the actions of Saks and Thompson and that, "but for" the respondents' wrongful actions, James would not have lost Thompson's large book of business to a competitor across the Mall.

The Court finds that the method used by Mr. Dubinsky in calculating James' damages is consistent with the ruling of the Supreme Court in *Worrie v. Boze*, 198 Va. 533 (1956). In that case, the Court ruled that, where the plaintiff's business had been profitable prior to the opening of respondents' business, "the jury had the right to infer that 'but for' [the] competition by the respondents, the plaintiff's profits would have been even greater." *Id.* at 543.

The Court finds, based on Mr. Dubinsky's testimony, that, over the last six full years of Thompson's employment at James, specifically from February 1, 1997, to January 21, 2003, Thompson consistently generated over $875,000 in annual sales, even in the years when the retail industry in Northern Virginia, and nationally, was significantly depressed by the downturn in the economy, the "dot com" bust, and the terrorist attacks of September 11, 2001. For fiscal years 1997 through 2000, Thompson generated more than $1 million in annual sales, with a high of $1,326,726 for fiscal year 1998. Mr. Dubinsky calculated Thompson's average sales revenue over the three years immediately prior to his departure to be in excess of $959,072, notwithstanding the fact that the three-year period included all the significant economic events previously

---

[8] The breach of contract claim relating to the Restrictive Covenant is remedied by injunctive relief only and will not be discussed herein.

noted. Thompson typically generated between 26.86% and 33.50% of James' total revenue, with the average being 27.82%.

Both parties presented testimony of experts in the retail business, and both Mr. Kessler and Mr. Krieg noted that, once a customer's relationship with a store is disrupted, it is difficult, if not impossible, to get that individual back as a customer. Because of their wrongful actions as noted in the previous sections, the respondents' diversion of customers to the Saks/Tysons store precluded James from recapturing Thompson's customers as they had been able to do in the past when other salespeople had left their employ without violating the Restrictive Covenant or taking customer lists and other proprietary information.

Respondents argue that, notwithstanding the fact that Thompson's sales revenues historically averaged 27.82% of the total sales volume for James' Tysons store, the complainant has not been damaged, or if it has, the amount of damage is minimal. They base this argument on the fact that, since James has been in a period of recovery and has taken efforts to minimize its losses and has, due to those efforts, not demonstrated significant losses since Thompson's resignation, it has not been damaged. Respondents further argue that the proper measure of damages in this case is not the totality of profits lost by James as the result of respondents' wrongful acts, but rather that James must demonstrate to the Court specific business relationships or customers who were lost and the precise amount of their lost sales that can be attributed to Thompson's persuading them to follow him to Saks.

This Court believes that the damage analysis in this case should be guided by the Supreme Court's ruling in *Worrie v. Boze*, 198 Va. 533 (1956), rather than the federal court cases upon which respondents rely. In this case, the plaintiffs owned a dance studio and had hired the respondents as dance instructors. The respondents' contracts included covenants not to compete during or within two years after leaving plaintiffs' employ. Upon terminating their employment, however, the respondents opened a dance studio in violation of the terms of their covenant. Plaintiffs filed suit alleging conspiracy to breach a contract and claimed damages as a result. The respondents argued that, even if there was a cause of action for injury to the plaintiffs' dance studio, they could not recover damages based on lost profits since the evidence established that plaintiffs' profits actually increased during the period at issue. The Supreme Court rejected this argument, stating:

> It is well settled that, in actions of this character involving injury to business or loss of profits, where the existence of a loss has been established, absolute certainty in proving its quantum is not

required. Where the plaintiff has shown to the satisfaction of the jury that he has suffered substantial damage by the injury, he is not precluded from recovering nor confined to merely nominal damages because he cannot show the exact amount with certainty. "[The] quantum may be fixed when the facts and circumstances are such as to permit an intelligent and probable estimate thereof."

*Id.* at 543 (citations omitted).

The Court went on to note that, prior to respondents' wrongful acts, the plaintiffs had an established, profitable, and growing business and that, *but for* the wrongful acts of the respondents, they would have been without competition in Richmond. Although plaintiffs' business continued to be profitable, the Court noted that the jury had the right to find that, without the unlawful competition, "the plaintiffs' profits would have been even greater." *Id.* Therefore, the Supreme Court of Virginia has recognized that this is an appropriate measure of damages in a case such as this.

Based on an analysis of the evidence in this case, the Supreme Court's rulings in *Worrie v. Boze* and *Advanced Marine*, and the reasoning of the Fourth Circuit in the case of *Famous Knitwear Corp. v. Drug Fair*, 493 F.2d 251 (4th Cir. 1974), it is this Court's opinion that complainant has proven a sound factual and legal basis for the award of damages against the respondents.

While disputing that James was entitled to recover damages, respondents presented expert testimony of Dr. Richard Edelman to demonstrate that any amount of damages to which complainant might be entitled was minimal. The Court found Dr. Edelman's testimony to be singularly unconvincing. He admitted that the James store, upon which he based his model, was not the same store as existed after the merger of the Tysons and Montgomery Mall locations; that he only selected seven data points, six of which were statistically insignificant; and that he conducted no independent investigation and instead relied on information and conclusions provided to him by counsel and by respondents' retail expert Mr. Krieg.[9] Much of the information upon which Dr. Edelman relied was contradicted by evidence at trial. Moreover, his conclusion that the quantum of lost profits is less than $50,000 is based, in part, on a calculation which attributes a 91% overhead rate to James,

---

[9] The Court found that much of Mr. Krieg's expert testimony was of minimal relevance since his surveys and statistical analysis did not have any relation to a small, exclusive store like James.

indicating that he charged James $.91 out of every $1.00 in revenue for costs of sale; this is such an outrageous number that it appears to have no basis in fact and must therefore be the product of advocacy from this expert, rather than objective expertise. For these reasons, the Court cannot rely on Dr. Edelman's testimony or opinions and will utilize the evidence produced by Mr. Dubinsky in calculating damages.

The Court now turns to an analysis and determination of the quantum of damages to which the complainant is entitled. Complainant's exhibit 23 contains Mr. Dubinsky's calculations of damages, which contain annual totals extending out from October 1, 2003, the date of Thompson's departure, to January 31, 2015, ten years after the trial. While this Court agrees with and adopts Mr. Dubinsky's damage analysis and calculations, extending out to 2015 is not supported by the facts or the law. Mr. Colen testified that he calculated the three-year period for the Restrictive Covenant based upon the amount of time James would be able to re-capture a customer after the departure of a salesperson; the time period which the Court has found Thompson should not be working at Saks/Tysons is three years. Accordingly, the Court believes that the damages should be calculated for a period of approximately three years from the date of Mr. Thompson's departure, October 1, 2003.

According to Mr. Dubinsky's calculations, the accuracy of which was not challenged by the respondents, the present value of James' projected lost profits from October 1, 2003, through January 31, 2006, is $538,690.00; prejudgment interest through September 30, 2004, is $9,921. Therefore, on Count I, Breach of Fiduciary Duty, the Court will award compensatory damages in favor of James, against Saks and Thompson, jointly and severally, in the sum of $548,611, together with interest and costs.

On Count VII, violation of Va. Code § 18.2-499 *et seq.*, the Court will award compensatory damages in favor of James, against Saks and Thompson, jointly and severally in the sum of $548,611; pursuant to the statute, that amount will be trebled to $1,654,833. It is the Court's intent that there be one award of compensatory damages of $548,622, although it is awarded in connection with two separate causes of action; the total damages awarded to complainant from respondents are $1,654,833. Having awarded statutory treble damages the Court will not award punitive damages on Count I. Further pursuant to the statute, the Court will hear further evidence and determine an award for attorneys' fees and costs to the complainant.

*Conclusion*

Accordingly, for the reasons set forth herein, the Court will enter judgment in favor of James against respondents Saks and Thompson, jointly and severally, as follows:

On Counts I and VII, compensatory damages in the sum of $548,611 plus interest and statutory costs;

On Count VII, statutory treble damages of $1,654,833 plus attorneys' fees and costs to be determined after further evidence and argument;

On Count IV, an injunction against respondent Thompson prohibiting him from working at Saks/Tysons for a period of three years beginning one week after the date of this letter opinion;

On the remaining Counts II, III, and VIII, in favor of respondents Saks and Thompson.