COURT OF APPEALS OF VIRGINIA

Present: Judges Chaney, Callins and Senior Judge Humphreys
Argued at Leesburg, Virginia

SEG PROPERTIES, LLC, ET AL.

MEMORANDUM OPINION* BY
v.      Record No. 1770-22-4                      JUDGE DOMINIQUE A. CALLINS
                                                           MAY 20, 2025
NTC MAZZUCA CONTRACTING, INC.

FROM THE CIRCUIT COURT OF LOUDOUN COUNTY
Douglas L. Fleming, Jr., Judge

Robert H.J. Loftus (McCandlish & Lillard, on briefs), for appellants.

Benjamin L. Williams (John T. Bergin; Cozen O'Connor;
Kilpatrick Townsend & Stockton LLP, on brief), for appellee.


This matter concerns a construction and mechanic's lien dispute involving the Silver

Eagle Shooting Range Facility in Loudoun County. NTC Mazzuca Contracting, Inc.

("Mazzuca"), the general contractor, sued SEG Properties, LLC and Silver Eagle Group, LLC

(collectively, "SEG"), the owners of the shooting range facility, alleging unjust enrichment,

breach of contract, tortious interference with an existing contract, and tortious interference with a

business relationship. SEG filed a counterclaim against Mazzuca for contract damages and

indemnification.

After referring the case to a commissioner in chancery, the circuit court confirmed the

commissioner's report in its entirety and entered judgment in favor of Mazzuca in the amount of

$1,253,521, plus prejudgment interest at 6% per annum, beginning 30 days after SEG's

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

termination of its contract with Mazzuca. Further, the court ordered SEG's property sold at auction to satisfy the liens, unless SEG posted a cash bond.

On appeal, SEG assigns 44 errors to the circuit court judgment, disputing various factual findings and legal conclusions.[1] For the following reasons, we affirm the circuit court's judgment.

## BACKGROUND

### I. The Contract Between SEG and Mazzuca, and the Role of JLL

On April 11, 2018, SEG entered into a contract (the "Contract") with Mazzuca to construct a private shooting range (the "Project") on SEG's property, a "fast track" job. To assist with the Project, SEG hired a project manager—Jones, Lang, LaSalle, Inc. ("JLL")—to, according to the bidding materials, serve in the capacity of "[SEG's] representative for 'all project and development matters.'" The agreement between SEG and JLL stated that JLL "shall assume all duties under this Agreement as an independent contractor; and in no event shall this be considered an agreement of employment, partnership or agency."

The same day that SEG and Mazzuca entered into the Contract, JLL notified Mazzuca to proceed with the Project. In May 2018, SEG and Mazzuca signed a "Rider" that supplemented and modified the terms of the Contract. Neither the Contract nor the Rider contained a specific performance deadline or a substantial completion date; the Contract only included a proposed project schedule.

---

[1] This number includes both main and subparts. And although the number of claims is not always indicative of the strength of a party's appeal, the "blunderbuss approach," *Tatusko v. Commonwealth*, 79 Va. App. 721, 729 (2024), SEG "utilized in this appeal is as unappreciated as it is ineffective," *Fadness v. Fadness*, 52 Va. App. 833, 851 (2008).

II.  Mazzuca's Payment Applications

The Contract provided that Mazzuca would file monthly payment applications ("PAs" or singular "PA") with the "Architect," who would evaluate Mazzuca's work and verify the amounts properly due; the Architect would then either issue a certificate for payment to SEG within seven days or notify SEG and Mazzuca of the Architect's reasons for withholding certification.  According to § 4.1.3 of the Contract, if the Architect received the PA prior to the 25th day of the month, SEG was required to pay Mazzuca "no[] later than the 25 [sic] day of the following month."  If the Architect received the PA "after the date fixed above," then SEG was required to pay Mazzuca no later than 30 days after the Architect received the PA.  The Contract further required that if a dispute arose concerning payment, SEG would continue making payments for all undisputed portions of the Project no later than 30 days after the Architect received the PA.

Mazzuca submitted six PAs in total.  JLL and Mazzuca both testified that, to "[s]peed things up," they employed a "pencil" PA process which differed from the terms of the Contract.  The "pencil" PA process involved Mazzuca submitting a "pencil" PA to JLL for review instead of sending the PA directly to the Architect for approval.  JLL would then review the PA and advise Mazzuca if it had any comments or concerns about the PA.  Upon completion of the "pencil" PA process, Mazzuca "was to send the final signed pay application back to the 'ownership team,' which included JLL, the Owner's representative."  Thereafter, JLL would forward the signed PA to the Architect.  JLL and Mazzuca adopted this "pencil" process for the first three PAs.

Regarding PA 1, Mazzuca submitted a "pencil" version to JLL on April 21, 2018.  Because there were clear errors in the PA, Mazzuca signed a revised PA 1 on April 24, 2018.

SEG did not pay Mazzuca for PA 1 until June 28, 2018, 65 days after Mazzuca signed the revised PA.

Mazzuca submitted PA 3 on June 29, 2018. Between June 29, 2018, and August 8, 2018, SEG and Mazzuca revised PA 3 as they considered whether certain change orders should be included or excluded. The base contract work value, however, from original submission to final submission, only decreased by one percentage point, from 70% to 69%. SEG paid the base contract work value of PA 3 on August 22, 2018.

III. SEG's Notice to Cure and Formula for Cure

On July 19, 2018, SEG issued to Mazzuca a notice to cure. SEG alleged that Mazzuca breached § 20.2.1 of the Contract by continually failing to supply skilled workers and grossly mismanaging the procurement process, which "caused delays in performance." The notice also stated that, per the Contract as amended by the Rider Section 20.2.1.5, SEG had the right to terminate Mazzuca for cause if Mazzuca "fail[ed] to timely perform the Work, or any part of the Work, in accordance with the published contract schedule dates." The notice to cure additionally stated that "[i]f your failures are not cured or your actions do not demonstrate a formula for cure satisfactory to SEG, within seven (7) days of today's date, we intend to terminate your contract for cause under the above stated articles." The notice to cure did not prescribe what constituted a satisfactory "formula for cure."

Mazzuca responded to the notice the day after its receipt, indicating its intent to complete the Project and asking to meet to discuss the progress on the Project. Mazzuca did not receive a response from SEG, and so continued working past the seven-day timeline SEG outlined for possible termination.

IV. SEG's Supplementation and Notice of Termination

On August 23, 2018, a little over one month after its notice to cure, SEG informed Mazzuca it was "immediately" supplementing Mazzuca's workforce under § 8.3 of the Contract. Contract § 8.3 required that SEG provide ten days' written notice to Mazzuca prior to supplementing its workforce. Instead, SEG supplemented Mazzuca's workforce the very next day, prior to Mazzuca's August 25, 2018 written response to the notice. On September 6, 2018, SEG terminated Mazzuca for cause, "effective immediately."

V. This Litigation

In 2019, Mazzuca initiated litigation to enforce a mechanic's lien, and its complaint alleged unjust enrichment, breach of contract, tortious interference with an existing contract, and tortious interference with a business relationship.[2] SEG countersued for breach of contract. Thereafter, the circuit court referred the case to a commissioner in chancery to make various findings of fact.

After nineteen days of hearings, the commissioner issued a 240-page report. In relevant part, the commissioner found that: (1) SEG breached the Contract when it failed to pay undisputed amounts to Mazzuca; (2) Mazzuca did not materially breach the Contract when SEG terminated Mazzuca for cause; (3) even if Mazzuca was in material breach, SEG was in prior material breach and not entitled to terminate Mazzuca for cause; (4) even if Mazzuca was in material breach, SEG failed to give proper notice of termination for cause, thus converting the termination into one of convenience; and (5) even if Mazzuca was in material breach and SEG's notice was proper, SEG failed to prove its costs to complete the Project.

---

[2] Several subcontractors and suppliers also sued SEG, and the cases were consolidated. This appeal concerns only SEG (consisting of SEG Properties, LLC and Silver Eagle Group, LLC) and Mazzuca.

In reaching these findings, the commissioner determined that JLL was an agent of SEG with actual or apparent authority to bind SEG to certain contract modifications. Further, the commissioner found that despite the Rider Section 3(a), which required Mazzuca to receive a signed change order prior to performing any work on the Project, the parties agreed to a modified process called "price and proceed" due to the accelerated nature of the Project. This "price and proceed" process referred to Mazzuca "pric[ing] the change orders at the same time it was proceeding with the work."

Finally, the commissioner found that Mazzuca was entitled to recover its contract damages of $1,253,521, that it had a valid and enforceable lien on the property, and that the 6% interest on recovery would accrue from October 6, 2018, 30 days following SEG's termination.

SEG filed 182 exceptions to the commissioner's report. After hearing argument on the exceptions, the circuit court confirmed the commissioner's report in its entirety, finding that the commissioner's findings and conclusions were supported by the evidence and the law. On October 27, 2022, the circuit court entered a final order overruling SEG's exceptions, confirming the commissioner's report in its entirety, and entering judgment in favor of Mazzuca for $1,253,521, plus prejudgment interest accruing from October 6, 2018, at a rate of 6% per annum until paid. The circuit court also ordered that the property be sold at auction to satisfy the liens unless SEG posted a cash bond for the benefit of Mazzuca and the other plaintiffs. SEG appeals.

ANALYSIS

"Although the report of a commissioner in chancery does not carry the weight of a jury's verdict, *see* Code § 8.01-610, 'an appellate court must give due regard to the commissioner's ability . . . to see, hear, and evaluate the witnesses at first hand.'" *Gilman v. Gilman*, 32 Va. App. 104, 115 (2000) (quoting *Jarvis v. Tonkin*, 238 Va. 115, 122 (1989)). "A commissioner's findings of fact which have been accepted by the trial court 'are presumed to be correct when reviewed on

appeal and are to be given "great weight" by this Court. The findings will not be reversed on appeal unless plainly wrong.'" *Id.* (quoting *Barker v. Barker*, 27 Va. App. 519, 531 (1998)).

In contrast, we review de novo the interpretation of a contract. *Palmer & Palmer Co., LLC v. Waterfront Marine Constr., Inc.*, 276 Va. 285, 289 (2008). "When a contract is clear and unambiguous, it is the court's duty to interpret the contract, as written." *Id.* In reviewing a contract, our "guiding light . . . is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the written instrument plainly declares." *Id.* (quoting *W.F. Magann Corp. v. Virginia-Carolina Elec. Works, Inc.*, 203 Va. 259, 264 (1962)).

> I. The circuit court did not err in confirming the commissioner's finding that SEG committed the first material breach of contract.[3]

SEG contends that by failing to pay its subcontractors in accordance with the Contract and failing to complete its work in a timely manner, Mazzuca committed the first material breach. Thus, SEG argues, the commissioner erred in finding that SEG committed the first material breach when it purportedly failed to timely pay the PAs and improperly supplemented Mazzuca's work force.

"A material breach is a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract." *Mathews v. PHH Mortg. Corp.*, 283 Va. 723, 730 (2012) (quoting *Horton v. Horton*, 254 Va. 111, 115 (1997)); *see also Countryside Orthopaedics, P.C. v. Peyton*, 261 Va. 142, 154 (2001) (defining material breach as the same). "[A]s a matter of Virginia common law, 'a party who commits the first breach of contract is not entitled to enforce the contract.'" *Mathews*, 283 Va. at 730 (quoting *Horton*, 254 Va. at 115). Indeed, "the first party to commit a material breach can neither enforce the

---

[3] In SEG's second assignment of error, it challenges the ruling of the circuit court that Mazzuca did not first materially breach the Contract. Because we affirm the circuit court that SEG committed the first material breach, we need not address this assignment of error.

contract nor maintain an action on it." *Countryside Orthopaedics*, 261 Va. at 156; *see also*

*Mathews*, 283 Va. at 730 ("If the initial breach is material, the other party to the contract is excused

from performing his contractual obligations."). Given these well-established principles, and as

SEG's position rises or falls on this crucial issue of first material breach, we now consider whether

the circuit court erred in its judgment. In so doing, we address each of SEG's arguments in turn.

A. The PAs

SEG first argues that the commissioner's finding is "plainly wrong" because the evidence

established that SEG paid PAs 1 and 3 in accordance with the Contract, which required undisputed

amounts to be paid within 30 days. SEG further argues that the commissioner erroneously found

JLL to be an agent of SEG with the authority to modify the parties' contractual terms regarding

PAs, in contravention of § 4.1.1 of the Contract.[4]

The parties do not dispute that the failure to timely pay in accordance with the Contract

constitutes a material breach. Thus, on appeal, we accept that SEG's failure to timely pay Mazzuca

constitutes a material breach of the Contract. Sections 4.1.1 to 4.1.3 of the Contract govern the

parties' respective responsibilities regarding the processing of PAs and payments:

> § 4.1.1 Based upon Applications for Payment *submitted to the Architect* by [Mazzuca] and Certificates for Payment issued by the Architect, [SEG] shall make progress payments on account of the Contract Sum to [Mazzuca] as provided below and elsewhere in the Contract Documents.
>
> § 4.1.2 The period covered by each Application for Payment shall be one calendar month ending on the last day of the month, or as follows:
>
> § 4.1.3 Provided that an Application for Payment is received by the Architect not later than the 25 [sic] day of a month, [SEG] shall make payment of the certified amount to [Mazzuca] not later than the 25 [sic] day of the following month. If an application for Payment is received by the Architect after the date fixed above,

---

[4] SEG advances these arguments in its assignment of error three, including its sub-parts.

> payment shall be made by [SEG] not later than thirty (30) days after the Architect receives the Application for Payment.

(Emphasis added). In short, the Contract required Mazzuca to submit the PAs to the Architect, and SEG to provide payment to Mazzuca no later than 30 days after receiving the PA (either on the 25th day of the following month or 30 days after receiving the PA). However, immediately after the parties entered into the Contract, SEG directed its agent, JLL, to engage with Mazzuca regarding the processing of payments to Mazzuca. JLL and Mazzuca then modified the payment process in a manner inconsistent with the terms of the Contract. Thus, whether JLL acted with authority to modify the PA process informs whether SEG failed to timely pay Mazzuca and, on that basis, materially breached the Contract.

### i. JLL had the authority to modify the PA process.

Payment made to Mazzuca by SEG later than 30 days "after the Architect receives the Application for Payment" constitutes a material breach of the Contract. So, crucial to our ultimate determination of breach is whether JLL acted as an agent sufficient to accept and process the PAs for SEG, thereby triggering the 30-day payment timeline.

"Agency is defined as a fiduciary relationship arising from 'the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the agreement by the other so to act.'" *Tingler v. Graystone Homes, Inc.*, 298 Va. 63, 101 (2019) (quoting *Hartzell Fan, Inc. v. Waco, Inc.*, 256 Va. 294, 300 (1998)); *see also Acordia of Va. Ins. Agency v. Genito Glenn, L.P.*, 263 Va. 377, 384 (2002) (defining agency the same). "The relationship of parties to a contract does not depend on what the parties themselves call the relationship, but rather on what the relationship actually is in law." *Tingler*, 298 Va. at 102 (quoting *Hartzell Fan*, 256 Va. at 300-01). "The power of control is the determining factor in ascertaining the alleged agent's status." *Id.* (quoting *Allen v. Lindstrom*, 237 Va. 489, 496 (1989)). "[W]hether

- 9 -

an agency relationship exists is a question to be resolved by the fact finder unless the existence of the relationship is shown by undisputed facts or by unambiguous written documents." *Id.* at 101-02.

Virginia agency law recognizes both actual authority and apparent authority. Implied authority, a form of actual authority, is "the power of the agent to affect the legal relations of the principal by acts done in accordance with the principal's manifestations of consent to him." Restatement (Second) of Agency § 7. Implied authority cannot be used as a vehicle to "create a power that does not exist or to expand an existing power beyond rational limits." *Foster v. Geller*, 248 Va. 563, 569 (1994) (quoting *Commonwealth v. Cnty. Bd. of Arlington Cnty.*, 217 Va. 558, 577 (1977)).

Apparent authority, however, concerns "the 'authority that a third party reasonably believes an agent has, based on the third party's dealings with the principal, even though the principal did not confer or intend to confer the authority.'" *Sanchez v. Medicorp Health Sys.*, 270 Va. 299, 303 (2005) (quoting *Black's Law Dictionary* 142 (8th ed. 2004)). "A 'principal is bound, under the doctrine of apparent authority, to the extent he holds out another as having the authority to act for him.'" *Doe v. Baker*, 299 Va. 628, 651 (2021) (quoting *Kern v. J.L. Barksdale Furniture Corp.*, 224 Va. 682, 685 (1983)). Indeed,

> An act is within the apparent scope of an agent's authority if, in view of the character of his actual and known duties, an ordinarily prudent person, having a reasonable knowledge of the usages of the business in which the agent is engaged, would be justified in believing that he is authorized to perform the act in question.

*Id.* (quoting *Neff Trailer Sales, Inc. v. Dellinger*, 221 Va. 367, 370 (1980)).

Additionally, "a course of dealing by contracting parties, considered in light of all the circumstances, may evince mutual intent to modify the terms in their contract." *Gov't Emps. Ins. Co. v. Hall*, 260 Va. 349, 356 (2000). But "modification of a contract must be shown by 'clear,

unequivocal and convincing evidence, direct or implied.'" *Reid v. Boyle*, 259 Va. 356, 370 (2000) (quoting *Stanley's Cafeteria, Inc. v. Abramson*, 226 Va. 68, 73 (1983)).

Here, we recognize that the agreement between SEG and JLL states that JLL "shall assume all duties under this Agreement as an independent contractor; and in no event shall this be considered an agreement of employment, partnership or agency." Yet, the bidding materials expressly state that JLL shall serve in the capacity of "[SEG's] representative for all project and development matters." *See Murphy v. Holiday Inns, Inc.*, 216 Va. 490, 492 (1975) ("[The] relationship of the parties does not depend upon what the parties themselves call it, but rather in law what it actually is." (alteration in original) (quoting *Chandler v. Kelley*, 149 Va. 221, 231 (1928))). *But cf. Atlantic Coast Realty Co. v. Townsend*, 124 Va. 490, 499 (1919) ("It is quite true, as contended, that parties cannot convert what in legal effect is a partnership agreement into a contract of agency merely by calling themselves principal and agent, respectively; but in construing contracts, words are to be given, primarily, their usual and ordinary meaning, unless a contrary meaning plainly appears, and the intention of the parties, if not contrary to law, must be carried out.").

The commissioner heard testimony from Mazzuca that although Mazzuca could have in theory submitted the PAs directly to the Architect, as the Contract requires, the PA "would have gone full circle back to JLL though." In other words, the Architect would have JLL, as SEG's representative, review PAs prior to his review. Therefore, Mazzuca could have reasonably believed that JLL had the authority to modify the Contract, regardless of whether SEG actually conferred such authority upon JLL. Thus, the record reflects that JLL had either implied or apparent authority to modify the Contract and employ the "pencil" PA process that the parties followed for PAs 1, 2, and 3.

On this point, however, SEG further argues that the circuit court erred because SEG did not waive the change order preapproval process of Rider Section 3(a), and because the "price and proceed" directive was an impermissible course of dealing modification. SEG's arguments on these points are unavailing.

"[W]aiver is an intentional relinquishment of a known right. 'In waiver, both knowledge of the facts basic to the exercise of the right and the intent to relinquish that right are essential elements.'" *Orthopaedic & Spine Ctr. v. Muller Martini Mfg. Corp.*, 61 Va. App. 482, 492 (2013) (alteration in original) (quoting *Stanley's Cafeteria*, 226 Va. at 74). The burden falls on the party asserting waiver to prove it "by clear, precise and unequivocal evidence." *Id.* (quoting *Stanley's Cafeteria*, 226 Va. at 74). This Court may decline to enforce otherwise clear and unambiguous terms if a party waives its right to enforce express terms through its conduct. *See Stockbridge v. Gemini Air Cargo, Inc.*, 269 Va. 609, 620 (2005). The Rider Section 3(a), in part, furnishes the writing requirement in dispute:

> (a) . . . No change in the Work shall be performed by [Mazzuca] or binding on [SEG] unless effected pursuant to a Change Order signed by [SEG]. If [Mazzuca] performs any changes in the Work without prior written authorization from [SEG], [Mazzuca] shall not be entitled to any change in the Contract Sum or Contract Time and shall not make any claim for unjust enrichment or *quantum meruit* based on a change in Work that has not been authorized in writing by [SEG]; notwithstanding any course of dealing between the parties or any implied acceptance of any change by [SEG].

The record demonstrates JLL's senior executive told Mazzuca that "anything we can do to accelerate at this point would look good." Additionally, the commissioner heard testimony that SEG wanted to open the gun ranges as soon as possible, and various witnesses testified of the urgency and speed with which SEG desired that the Project be completed. Indeed, Mazzuca began performing work before the parties entered into the Contract. Within the context of this urgency, JLL emailed Mazzuca on June 6, advising that "all discussed change orders are price

and proceed," meaning that the parties waived the Rider's timing requirement of obtaining a written change order *prior* to performing the work. The record reflected that JLL never withdrew its "price and proceed" directive. Given the testimony of the accelerated pace of the Project and JLL's express statement to "price and proceed," the circuit court had before it clear and convincing evidence that the parties did *not* dispense with the requirement of a written change order, but rather that the parties waived the Rider's timing requirement.

We reject SEG's contention that the "price and proceed" directive constituted an impermissible course of dealing modification in violation of the Rider Section 3(a). Because JLL issued the directive in writing, the parties did not modify the timing of Rider Section 3(a) by its "course of dealing." It expressly changed the terms by writing. Therefore, we agree with Mazzuca that the circuit court did not err.

In sum, the circuit court did not err in adopting the commissioner's findings that (1) JLL was an agent and that the parties modified the contractual process so that "Mazzuca worked through JLL, and JLL would transmit the final, signed pay application to the Architect"[5]; (2) SEG waived the change order preapproval process of Rider Section 3(a); and (3) the "price and proceed" directive was not an impermissible course of dealing modification. So, we now address whether SEG committed the first material breaches by failing to timely pay the PAs.

---

[5] Because we conclude that JLL was an agent of SEG and acted with the authority to modify the contractual process, we reject SEG's contentions that JLL did not so modify the PA process with the effect that the timeline for payment only began when JLL submitted the PAs to the Architect.

ii. SEG failed to timely pay PA 1 and 3.

For PA 1, SEG argues that the commissioner was plainly wrong in finding that it failed to timely pay because the Contract does not require that Mazzuca submit its PAs by the 25th of the month.[6]

The commissioner found that SEG did not timely pay PA 1 and therefore materially breached the Contract. On April 21, Mazzuca submitted an initial PA 1 to JLL, but subsequently signed a revised version on April 24. The record is unclear as to when Mazzuca sent the revised PA 1 to JLL. But as the Contract called for PAs to be submitted by the 25th day of the month, the commissioner found Mazzuca "obviously highly motivated to get its pay applications to JLL on time" and that the PA "should have been in the Architect's hands by the end of April." Nonetheless, SEG did not wire payment to Mazzuca until June 28. According to the commissioner's report, the payment occurred "approximately four weeks after the expiration of the 30-day shot clock."

We find no error in the judgment of the circuit court that SEG failed to timely pay PA 1 and thus materially breached the Contract. Mazzuca followed the agreed "pencil" process and submitted its PAs to JLL. Mazzuca submitted PA 1 to JLL on or before the end of April, rendering payment due, at the latest, by May 30. SEG did not pay Mazzuca for PA 1 until June 28. This late payment constituted a breach of the Contract.

As for PA 3, SEG argues that the base contract work was disputed, noting that the base contract amount increased at one point by 4%. SEG further argues, similar to its argument regarding PA 1, that, according to § 4.1.1 of the Contract, payment is not triggered until the Architect receives the PA. Finally, SEG appears to argue that the circuit court premised its

---

[6] To this point, SEG again argues that JLL was not SEG's agent and did not have authority to accept PA 1 to begin the timeline for payment. Because we hold that JLL was SEG's agent, we find this argument meritless.

erroneous conclusion on the commissioner's incorrect finding that SEG did not "request" lien waivers.

The commissioner found that SEG materially breached the Contract when it failed to pay PA 3 by August 13, 2018. Rider Section 20 provides that if disputes arise, "[SEG] shall continue to make payment for undisputed portion of the Work pending resolution of said claim or dispute." Between June 29 and August 8, 2018, SEG and Mazzuca revised PA 3, as they considered whether certain change orders should be included or excluded. The base contract work value, however, remained effectively undisturbed. From original submission to final submission, it only changed 1% (changing from 70% of the base contract completed to 69% of the base contract completed). The commissioner found that, per the Contract and the Rider, SEG should have paid the undisputed base contract amount and "left the change order dispute for another day."

We cannot conclude that the commissioner's factual findings on PA 3 are plainly wrong or without evidence. The commissioner found that the overall base contract percentage, after being edited, was "only 1% less than the original [PA 3] submitted . . . . In short, the base contract work value (70% v. 69%) had effectively remained undisputed since Mazzuca originally submitted [PA 3]." Thus, the commissioner found that, per Section 20 in the Rider, SEG was required to pay the undisputed base contract value. Although the number fluctuated at one point by 4%, it was nonetheless in the commissioner's discretion to determine if the overall base contract percentage was "disputed." Because, from the first submission to the last, the base contract value only fluctuated by 1%, the commissioner properly found that this amount was "undisputed." In sum, we cannot say that the circuit court, by adopting the commissioner's conclusion, was plainly wrong or without evidence to support its finding.

- 15 -

Finally, SEG misunderstands the commissioner's finding, arguing that the commissioner found SEG's payment untimely, in part, because SEG did not "request" lien waivers. To the contrary, the commissioner expressly found that because SEG processed PAs 1, 2, and 3 without lien waivers, its finding of untimely payment was unimpacted by the absence of waivers. Thus, we affirm the circuit court's judgment that SEG was in material breach of its payment obligation and that SEG committed the first material breach of the Contract.[7]

### B. SEG's Supplementation

SEG next contends that the commissioner erred in finding that SEG's supplementation of Mazzuca's work force was a material breach of the Contract.[8] Because SEG "provided material [Mazzuca] could not," SEG argues that the supplementation "did not go to the root of the Contract, nor violate it." Mazzuca, in turn, argues that Section 8.3 of the Contract permitted SEG to supplement Mazzuca's workforce, but it required SEG to give ten days' written notice. Because SEG supplemented Mazzuca's workforce the very next day, the commissioner did not err in concluding the notice was insufficient and a breach of contract. We agree with Mazzuca.

"[W]hen the terms in a contract are clear and unambiguous, the contract is construed according to its plain meaning." *TravCo Ins. Co. v. Ward*, 284 Va. 547, 552 (2012) (quoting *Barber*

---

[7] Because "a party who commits the first breach of a contract is not entitled to enforce the contract," we do not address SEG's assignment of error 11 regarding the circuit court's alleged failure to find that SEG proved its cost to complete. *Mathews*, 283 Va. at 730. In *ADC Fairways Corp. v. Johnmark Construction, Inc.*, 231 Va. 312, 318 (1986), our Supreme Court "dispel[led] any notion that an offset is not among the entitlements the enforcement of which is lost on account of a party's material breach." *SunTrust Mortg., Inc. v. United Guar. Residential Ins. Co.*, 809 F. Supp. 2d 485, 491 (E.D. Va. 2011). For the same reason, we also consider SEG's assignments of error 7(A)-(D) regarding the exclusion of one of its damages experts moot and irrelevant.

[8] Because we affirm the circuit court's determination that SEG first materially breached the Contract by failing to timely pay PA 1 and 3, we need not determine whether SEG's supplementation was also a *material* breach of the Contract. Thus, we address supplementation to evaluate only whether the notice was proper.

*v. VistaRMS, Inc.*, 272 Va. 319, 329 (2006)). "Words that the parties used are normally given their usual, ordinary, and popular meaning." *Id.* (quoting *City of Chesapeake v. States Self-Insurers Risk Retention Grp., Inc.*, 271 Va. 574, 578 (2006)). "No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly." *Id.* (quoting *States Self-Insurers*, 271 Va. at 578).

Contract Section 8.3 permits SEG to supplement Mazzuca's workforce *after* providing written notice and allowing Mazzuca ten days to correct the alleged deficiency:

> If [Mazzuca] defaults or neglects to carry out the Work in accordance with the Contract Documents, and *fails within a ten-day period after receipt of written notice* from [SEG] to commence and continue correction of such default or neglect with diligence and promptness, [SEG], without prejudice to any other remedy [SEG] may have, may correct such deficiencies and may deduct the reasonable cost thereof.

(Emphasis added).

It is undisputed that on August 23, 2018, SEG sent a letter to Mazzuca stating that it was acting "to immediately supplement your workforce." SEG noted that Mazzuca remained in breach and that, pursuant to Section 8.3, SEG planned to correct all deficiencies and deduct the reasonable costs from Mazzuca's payment. After sending its letter, SEG did not wait ten days—it supplemented Mazzuca's work force the very next day. Despite SEG's premature supplementation, Mazzuca sent a letter on August 25, 2018, expressing its desire to complete the Project. The record reflects that SEG did not respond to this letter. Giving proper weight to the determinations of the fact finder, and recognizing the plain terms within Section 8.3, we conclude that the circuit court was not plainly wrong nor without evidence to determine that SEG's notice to supplement was improper.

II. The circuit court did not err in confirming the commissioner's finding that SEG's notice to cure was insufficient to support termination for cause.

SEG assigns error to the circuit court's determination that SEG's July 19, 2018 notice to cure was improper. Specifically, SEG contends that, when evaluating whether Mazzuca was in "material default," the commissioner applied the incorrect standard and that it should have instead evaluated whether Mazzuca failed to perform "any part of the work within the time period provided in the Contract documents." In tandem, SEG argues that the commissioner's finding that it terminated Mazzuca for convenience, rather than for cause, is plainly wrong. It argues that the court "rewrote" the Contract by requiring a "second notice to terminate" and that the Contract does not limit the time within which termination had to occur after the notice. Although we agree that the circuit court applied the incorrect standard of "material default" in adopting the commissioner's report, it nonetheless reached the correct result. *See Harris v. Commonwealth*, 39 Va. App. 670, 676 (2003) (en banc) ("An appellate court may affirm the judgment of a trial court when it has reached the right result for the wrong reason." (quoting *Driscoll v. Commonwealth*, 14 Va. App. 449, 452 (1992))).

Section 20.2.1 of the Contract provides that SEG may terminate the Contract for cause, among other things, if Mazzuca "otherwise is guilty of *substantial breach* of a provision of the Contract Documents." (Emphasis added). Even were for-cause termination justified under § 20.2.1, § 20.2.2 requires that SEG first provide proper written notice to Mazzuca as follows:

> upon certification by the Architect that sufficient cause exists to justify such action, [SEG] may, without prejudice to any other remedy [SEG] may have and after giving [Mazzuca] *seven days' written notice*, terminate the Contract and take possession of the site and of all materials, equipment, tools, and construction equipment and machinery thereon owned by [Mazzuca] and may finish the Work by whatever reasonable method [SEG] may deem expedient.

- 18 -

(Emphasis added). Conversely, the Contract provides that if SEG terminates the Contract for convenience, it may do so "at any time." If SEG terminates for convenience, Mazzuca would subsequently "be entitled to receive payment for Work executed, and costs incurred by reason of such termination, along with reasonable overhead and profit on the Work not executed."

On September 6, 2018, SEG terminated Mazzuca "effective immediately." In its termination letter, SEG noted that Mazzuca "failed to cure the extensive breaches of contract detailed in [its] letter dated July 19, 2018." The commissioner found that SEG improperly terminated Mazzuca for cause as (1) Mazzuca was not in material default of the Contract; and (2) even if it had been in material default, SEG failed to provide the seven days' written notice required.

Employing an extensive analysis, the commissioner found that the reason for termination cited in SEG's notice to cure was unjustified and unsupported by the evidence. Notably, the commissioner did not find that SEG proved *Mazzuca* to blame for significant delays in the accelerated Project. Further, the commissioner analysis concerning whether Mazzuca was in "material default" the date of the notice to cure is of no moment. The commissioner found, and we affirm, that SEG first materially breached the Contract in May 2018. Although we recognize that the commissioner applied the incorrect standard of "material default"—instead of "substantial breach"—this error was harmless considering the commissioner's earlier finding that SEG first materially breached the Contract. "If the first breaching party committed a material breach . . . that party cannot enforce the contract." *Mathews*, 283 Va. at 730 (quoting *Horton*, 254 Va. at 115). Under the doctrine of first material breach, the relevant inquiry is not whether a party merely breached the terms of a contract, but rather whether a party failed to "do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract." *Id.* (quoting *Horton*, 254 Va. at 115). Here, given SEG's first

material breaches, discussed *supra*, Mazzuca was no longer entitled to enforce the Contract, and the commissioner's application of the incorrect standard was harmless error.

We also reject SEG's contention that the commissioner erred in finding that Mazzuca offered a formula for cure in response to SEG's notice. The notice to cure stated that "[*i*]*f* your failures are not cured or your actions do not demonstrate a formula for cure satisfactory to SEG, within seven (7) days of today's date, *we intend to terminate your contract for cause* under the above stated articles." (Emphases added). The notice to cure did not outline what constituted a satisfactory "formula for cure." Still, the very next day, Mazzuca responded in writing and included a revised milestone schedule with additional information for SEG to consider. Mazzuca expressed its desire to complete the Project with "urgency" and that it anticipated the "successful completion of [the] project." The evidence supports the commissioner's finding and circuit court's judgment that SEG's notice to cure was improper, and this finding is not plainly wrong.

SEG, however, insists that the Contract does not require termination "on the 7th day," and for the circuit court to interpret the Contract as containing such a requirement amounts to the court "rewrit[ing] the Contract." We disagree. "Courts will not rewrite contracts; parties to a contract will be held to the terms upon which they agreed." *City of Chesapeake v. Dominion Securityplus Self Storage, LLC*, 291 Va. 327, 335 (2016) (quoting *Dewberry & Davis, Inc. v. C3NS, Inc.*, 284 Va. 485, 496 (2012)). Yet, here, SEG overlooks that SEG itself imposed the seven-day period for cure. Indeed, its notice expressly communicates to Mazzuca that SEG would terminate the Contract unless one of two events occurred within seven days: (1) cure "the failures" or (2) "demonstrate a formula for cure satisfactory to SEG." Mazzuca, having responded to the notice the following day with a proposed revised schedule, and not hearing any response from SEG, was entitled to believe that SEG accepted its formula for cure and that it could continue to perform on the Contract.

Indeed, by the terms of its own notice, SEG's failure to respond to Mazzuca's proposal, coupled with the passage of time, could reasonably be construed as acceptance. As the commissioner noted,

> SEG could not indefinitely dangle the July 19th notice to cure letter as a Damoclean sword over Mazzuca, invite Mazzuca to continue to perform for weeks, strongly suggest in late August that the Contract time had not expired . . . and then terminate effective immediately without renewing the seven days' notice.

By issuing a notice to cure 49 days prior to terminating the Contract—and despite a self-imposed seven-day deadline—SEG deprived Mazzuca of proper notice as contemplated by § 20.2.2. of the Contract. The circuit court did not err in its judgment that SEG terminated the Contract for convenience, not for cause, as SEG's notice to cure was improper.

III. Covenant of Good Faith and Fair Dealing[9]

SEG contends that the circuit court erroneously "imposed a covenant of good faith on the contract" by creating new standards, duties, and obligations for SEG "not set forth in the [C]ontract."

Under Virginia law, "when parties to a contract create valid and binding rights, an implied covenant of good faith and fair dealing is inapplicable to those rights." *Ward's Equip. v. New Holland N. Am.*, 254 Va. 379, 385 (1997). Indeed, where a contract expressly provides for certain duties and obligations "such a covenant cannot be the vehicle for rewriting [the] unambiguous contract in order to create duties that do not otherwise exist." *Id.* By logical extension, however, *Ward's Equipment* does not bar the operation of the implied covenant of good faith and fair dealing in the absence of expressly created contractual rights and duties. In

---

[9] In its assignment of error 8(A), SEG contends that the circuit court applied the wrong burden of proof in finding SEG breached the covenant of good faith and fair dealing. SEG provides no argument or authority in support of this assignment, so we do not consider it. *See* Rule 5A:20; *Fadness*, 52 Va. App. at 850 ("Unsupported assertions of error 'do not merit appellate consideration.'" (quoting *Jones v. Commonwealth*, 51 Va. App. 730, 734 (2008))).

fact, *Ward's Equipment* tacitly contemplates the operation of the implied covenant and delineates the circumstances in which it is inoperative.

For example, if a contract is silent regarding the time for performance, then the law implies that performance must be rendered within a "reasonable time." *Merriman v. Cover, Drayton, & Leonard*, 104 Va. 428, 442 (1905); *see also McDaniel v. Daves*, 139 Va. 178, 187 (1924) ("'[A]n agreement to do something other than to pay money, no time being expressed, means a promise to do it in a reasonable time,' and such we understand to be the law of this State." (quoting *Young v. Ellis*, 91 Va. 297, 301 (1895))); *S. Ry. Co. v. Wilcox*, 99 Va. 394, 402 (1901) (determining that because a contract did not fix the time by which rock was to be delivered for shipment, "[t]he plaintiffs had, therefore, a reasonable time within which to deliver it").

We reject SEG's contention that the circuit court erroneously imposed a covenant of good faith and fair dealing and created new obligations not contemplated by the Contract. Because the Contract did not provide a specific time for Mazzuca's performance, the circuit court found that Mazzuca "was entitled to a decision seasonably made from [SEG] about the claimed change or extra work claim even though the decision might be unfavorable." Indeed, the commissioner found that SEG gave no reasonably prompt decision as to any change order, nor did it state any decision following Mazzuca's termination. Thus, the circuit court found that SEG "did not act in good faith." We agree that "[w]hile [SEG] could give 'no' for an answer as to a change order," it could not ignore Mazzuca indefinitely. This reasoning is in line with our jurisprudence that in the absence of a specific time for performance, a party has a *reasonable* time to perform. For Mazzuca to complete the work contracted for—and for SEG to benefit from said work—SEG certainly needed to process the change orders that Mazzuca submitted. Therefore, we hold the circuit court did not err in imposing the reasonable time standard.

- 22 -

IV. Additive and Deductive Change Orders

An additive change order expands the scope of work originally agreed upon in a contract, while a deductive change order reduces the scope of work agreed upon in a contract, thereby increasing or decreasing the contract price. The commissioner found that SEG was not entitled to certain deductive change orders and that Mazzuca was entitled to certain additive change orders. SEG argues that: (1) the additive change orders were approved on incorrect standards that "completely rewr[ote] the contract and impose[d] duties where none exist[ed]"; (2) the evidence did not support the additive change orders' approval; and (3) the evidence supported the approval of the deductive change orders.[10] In response, Mazzuca maintains the correctness of the circuit court's findings. We agree with Mazzuca that the circuit court did not err.[11]

The commissioner found various reasons that entitled Mazzuca to receive payment for the additive orders.[12] First, many of the change orders "included a recommended approval amount by JLL" and the parties agreed upon a reduced value, as demonstrated in the "recommended for approval" column in JLL's change order log (change order 8). Second, other change orders "had been pending for months" and Mazzuca "was entitled to a decision within a reasonable time" (change orders 39 and 40). Third, regarding change order 68, the Architect's testimony that "he expected a change order at some point" was "more persuasive," and since

---

[10] SEG disputes the commissioner's finding that Mazzuca was entitled payment for the following additive change orders: 1, 2, 4-9, 12-14, 16, 18, 20, 39, 40, and 68. SEG disputes the commissioner's finding that SEG was not entitled to deductive orders 77-98.

[11] We reject SEG's first argument that the findings concerning the additive orders 1, 2, 4, 7-9, 12-14, 16, 18, and 20 were premised on incorrect legal standards for the reasons stated, *supra*. As determined, the parties modified the Contract to include a "price and proceed" process, and the circuit court did not impermissibly create new duties and standards by imposing an implied covenant of good faith and fair dealing. Thus, SEG's first contention is unavailing.

[12] Given our rejection of SEG's first argument here, *supra* note 11, the only additive orders left for this Court to address are 5-6, 39, 40, and 68.

SEG did not challenge the amount proposed, Mazzuca was entitled to payment. All of these findings were within the commissioner's discretion; the commissioner properly assessed the testimony and evidence and found that Mazzuca was entitled to these specific additive change orders.

As to the deductive change orders, the commissioner heard testimony that "there was no physical proposed change order document generated" for the 22 change orders and that "the amounts shown were simply estimates." Although the JLL change order log reflected the deductive orders 77-98, the Mazzuca change order log did not reflect these orders. The Architect also testified that he was unaware of any formal deductive change orders issued. What is more, Mazzuca's principal witness testified that no deductive change orders were actually issued to Mazzuca. Thus, the commissioner found that there was no credible evidence of SEG's entitlement to deductive change orders 77-98. Recognizing that on appeal we must give "great weight" to the commissioner's findings of fact, as adopted by the circuit court, we cannot say that the decision to exclude deductive orders 77-98 was plainly wrong. *See Gilman*, 32 Va. App. at 115.

V. Mazzuca's Proof of Damages and Mechanic's Lien

SEG argues that Mazzuca "did not prove its damages and its lien is invalid" because (1) Mazzuca is not entitled to payment for PAs 4, 5, and 6; and (2) the defective ramp should have been deducted from Mazzuca's recovery. Again, we hold that the circuit court did not err.

"The standard of review for a damages calculation has been framed as whether there were 'sufficient facts' to support the award." *Preferred Sys. Sols., Inc. v. GP Consulting, LLC*, 284 Va. 382, 399 (2012) (quoting *Nichols Constr. Corp. v. Va. Mach. Tool Co.*, 276 Va. 81, 89 (2008)). "We have said that damages awards must not be 'contingent, speculative, or uncertain.'" *Id.* (quoting *Sunrise Continuing Care, LLC v. Wright*, 277 Va. 148, 154 (2009)). "It

is sufficient if a reasonable basis of computation is afforded." *Id.* (quoting *Wash. Golf & Country Club, Inc. v. Briggs & Brennan Devs., Inc.*, 198 Va. 586, 592 (1956)). Understanding these well-established principles, we address SEG's contentions in turn.

### A. PAs 4, 5, and 6

SEG argues that Mazzuca was not entitled to payment for PAs 4, 5, and 6 because the PAs were unapproved or rejected, and SEG's work was incomplete. Section 20.3 of the Contract states that in the event SEG terminates the Contract for convenience, Mazzuca "shall be entitled to receive payment for Work executed, and costs incurred by reason of such termination, along with reasonable overhead and profit on the Work not executed." Given the express terms of § 20.3, the commissioner could have found that Mazzuca was entitled to payment for PAs 4, 5, and 6 despite the PAs not having been fully submitted, provided the work was "executed" or that reasonable overhead incurred or profit earned on "unexecuted" work. The commissioner, having found that SEG terminated for convenience, properly applied § 20.3 and awarded Mazzuca the "costs incurred by reason of [SEG's] termination," including "profit on the Work not executed." Thus, the circuit court did not err in adopting this conclusion here.

### B. Defective Ramp

SEG argues that the commissioner erred in finding that the "ramp was not determined to be defective" and that the $110,000 repair cost should have been included in the court's analysis of Mazzuca's work left uncompleted (and thereby deducted from Mazzuca's recovery amount).

The commissioner noted that the "history of the change order for the ADA ramp is, at best, confusing." SEG "showed a deductive change order (No. 83) for a rebuild of the ADA ramp in the amount of $110,000." Because that change order "was never issued and was simply an unsupported estimate," the commissioner found the evidence insufficient to establish that Mazzuca's work was defective. *Johnson v. Cauley*, 262 Va. 40, 47 (2001) ("[T]he finder of

fact[] was entitled to weigh the evidence and determine the credibility of the witness."). Further, the evidence established that a subcontractor directed to construct the ramp received two different drawings of the ramp which "showed two different lengths." Mazzuca directed the subcontractor to proceed.

We only reverse a factual finding if it is plainly wrong or unsupported. That is not the case here. Thus, the circuit court acted within its discretion in agreeing with the commissioner's decision to exclude the cost of constructing the ramp when calculating Mazzuca's damages.

VI. Prejudgment Interest

SEG argues that the circuit court erred in awarding Mazzuca prejudgment interest at 6% per annum until paid because (1) Mazzuca's claim against SEG is unliquidated, and "[p]rejudgment interest is not awarded on unliquidated claims"; (2) Mazzuca did not request prejudgment interest on its lien enforcement count and therefore is precluded from recovering interest; and (3) if any interest is recoverable, it should be 1%, in accordance with Section 4.1.5 of the Contract.[13] In relevant part, Mazzuca counters that SEG admits that Mazzuca's damages are liquidated and that Code § 6.2-302 "establishes a 6% floor for prejudgment interest," and therefore, the circuit court properly awarded the prejudgment interest rate at 6% over the contractual 1% interest rate. We agree with Mazzuca.

"While the common law of England restricted the award of interest on a judgment, the General Assembly in the early days of our Commonwealth enacted laws permitting prejudgment and post-judgment interest to be awarded, both at law and in equity." *Moncrieffe v. Deno*, 76 Va. App. 488, 505-06 (2023). "'[N]atural justice [requires] that he who has the use of another's

---

[13] Mazzuca insists that this argument "be disregarded" as not properly preserved. We disagree. Notwithstanding SEG's failure to include the argument in its formal list of 182 exceptions, SEG made this argument before the circuit court. Thus, it is preserved. *See* Code § 8.01-384.

money should pay interest for it.'" *Id.* at 506 (second alteration in original) (quoting *Upper Occoquan Sewage Auth. v. Blake Constr. Co.*, 275 Va. 41, 63 (2008)).

Pursuant to Code § 8.01-382, a circuit court may award prejudgment interest on a judgment award. *See also Devine v. Buki*, 289 Va. 162, 179 (2015). Specifically, the statute provides that a court "may provide for interest on any principal sum awarded, or any part thereof, and fix the period at which the interest shall commence." Generally, a circuit court may not award prejudgment interest on unliquidated damages. *Advanced Marine Enters. v. PRC, Inc.*, 256 Va. 106, 126 (1998); *see also Beale v. King*, 204 Va. 443, 447 (1963) ("The general rule is that in the absence of agreement or statute to the contrary, interest is not recoverable on an unliquidated demand."). "However, the issue [of] whether interest should be awarded, and from what date any interest should run, is a matter submitted to the sound discretion of the trial court." *PRC*, 256 Va. at 126; *Devine*, 289 Va. at 179 ("This Court has recognized that Code § 8.01-382 'leaves the assessment of interest in the discretion of the fact-finder.'" (quoting *J.W. Creech, Inc. v. Norfolk Air Conditioning Corp.*, 237 Va. 320, 325 (1989))); *see also Wolford v. Williams*, 195 Va. 489, 499 (1953) ("The allowance of interest is in the sound discretion of the trial court."). Accordingly, we review a circuit court's decision to award prejudgment interest for an abuse of discretion. *See Wolford*, 195 Va. at 499; *Moncrieffe*, 76 Va. App. at 507.

Regarding the applicable judgment rate of interest, we consider Code § 6.2-302. In relevant part, the statute states:

> The judgment rate of interest shall be an annual rate of six percent, except that a money judgment entered in an action arising from a contract shall carry interest at the rate lawfully charged on such contract, or at six percent annually, *whichever is higher*.

Code § 6.2-302(A) (emphasis added). As we have previously recognized, "[t]hat 6% rate generally applies unless a contract specifies a higher rate for prejudgment or post-judgment interest." *Moncrieffe*, 76 Va. App. at 507.

- 27 -

Section 4.1.5 of the Contract states that "[p]ayments due and unpaid under the Contract shall bear interest from the date payment is due at the rate stated below . . . 1%." As we recited *supra*, "[c]ourts will not rewrite contracts; parties to a contract will be held to the terms upon which they agreed." *Am. Standard Homes Corp. v. Reinecke*, 245 Va. 113, 122 (1993) (quoting *Bank of Southside Va. v. Candelario*, 238 Va. 635, 640 (1989)). Moreover, "[i]t is axiomatic that when the terms in a contract are clear and unambiguous, the contract is construed according to its plain meaning." *TravCo Ins.*, 284 Va. at 552. The circuit court awarded Mazzuca prejudgment interest accruing from October 6, 2018,[14] the date 30 days following SEG's termination, at a rate of 6% per annum pursuant to Code § 6.2-302.

By the clear and unambiguous terms of the Contract, § 4.1.5 contemplates the application of interest on unpaid—or unliquidated—claims. Indeed, the phrase "shall bear interest *from the date payment is due*" indicates that SEG and Mazzuca mutually agreed that interest would in fact begin from the date payment is *due*. Thus, the circuit court was within its discretionary authority to award prejudgment interest beginning on October 6, 2018—30 days following SEG's termination of Mazzuca. Given SEG's contractual obligation to pay all undisputed amounts to Mazzuca within 30 days, all undisputed amounts would have been "due," at the latest, 30 days following SEG's termination.

We disagree with SEG's contention that the circuit court erred in awarding the statutorily prescribed 6% prejudgment interest rate instead of the 1% interest rate in the Contract. Code § 6.2-302(A) provides that the prejudgment interest rate to be applied is either (1) "the rate lawfully charged on [the] contract" *or* (2) "at six percent annually, *whichever is higher*."

---

[14] The parties do not argue that the circuit court erred in selecting this specific date for prejudgment interest to accrue. Rather, SEG argues generally that prejudgment interest cannot be awarded on any unliquidated claim (and contends that the claim was unliquidated until June 2022).

(Emphasis added). Stated differently, Code § 6.2-302 creates a mandatory 6% floor for prejudgment interest. Parties to a contract may agree upon an interest rate *higher* than "six percent annually"—but they cannot be bound to less. In the event parties do contract to an applicable interest rate less than 6%, the statute requires a circuit court to award the 6% rate. Thus, the circuit court did not err when it followed the mandate of Code § 6.2-302 and awarded Mazzuca prejudgment interest at 6% per annum.

Additionally, we reject SEG's contention that Mazzuca did not properly request prejudgment interest in its complaint and is therefore precluded from recovering said interest. We recognize that "although the award of prejudgment interest is discretionary, it is still 'part of the actual damages sought to be recovered.' As such, prejudgment interest, like other damages, must be requested in a pleading before it can be awarded by a trial court." *Devine*, 289 Va. at 179 (quoting *Dairyland Ins. Co. v. Douthat*, 248 Va. 627, 631 (1994)). Although Mazzuca did not request prejudgment interest on its specific lien enforcement count, it nevertheless requested prejudgment interest throughout its amended complaint. Thus, we find that Mazzuca properly pleaded for the relief the circuit court granted—prejudgment interest. *See id.* (holding that the trial court erred in awarding prejudgment interest because the amended complaint contained no request for prejudgment interest). In sum, we affirm the circuit court's judgment awarding prejudgment interest at 6% per annum beginning October 6, 2018.

CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court.

*Affirmed.*

- 29 -